FILED
COURT OF APPEALS
DIVISION II

2013 DEC 10 AM 9: 51

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>v.<br><br>NICK TAYLOR ARQUETTE,<br><br>                Appellant. | No. 42546-7-II<br><br>(Consolidated)<br><br><br>PUBLISHED OPINION |
| In re the Personal Restraint Petition of,<br><br>NICK TAYLOR ARQUETTE,<br><br>                Petitioner. | No. 42974-8-II |

BJORGEN, J. — Following a bench trial, Nick Taylor Arquette was found guilty of first degree perjury. Arquette appeals his conviction, asserting that (1) sufficient evidence did not support his conviction and (2) his conviction subjected him to double jeopardy. We consolidated Arquette's direct appeal with his personal restraint petition (PRP), in which he argues that (1) sufficient evidence did not support his previous conviction for second degree perjury following a

jury trial and (2) his previous appellate counsel was ineffective for failing to challenge the sufficiency of evidence in his previous direct appeal. Holding that the State's corroborating evidence was not inconsistent with Arquette's innocence, we grant Arquette's PRP, reverse his convictions, and remand to the trial court to dismiss both charges with prejudice.

## FACTS

### A.    Background

In March 2009, Gary McKee paid Robert Tribble $140 for a 1970 Datsun truck that, unknown to McKee, belonged to Tribble's roommate, Arquette. When Tribble failed to deliver the truck, McKee went to Tribble's home to look for him. There McKee met Arquette, who explained to McKee that he was the owner of the Datsun truck and not Tribble. The parties disagree as to what happened next.

According to McKee, Arquette told him that "he would give me the title . . . as soon as I brought [Tribble] there, so he could tell [Tribble] to no longer come to his property." Clerk's Papers (CP) at 57. McKee stated that after he brought Tribble to Arquette's home a couple of days later, Arquette retrieved the Datsun's title from another truck, went into the house to sign it, and then handed the title to him. McKee also stated that, because the truck was not in running order, he came back to the house a couple of days later to tow it away. McKee said that Arquette was present on the day he came to tow the Datsun away and that Arquette had to move another truck to provide him access to the Datsun.

In contrast with McKee's account of events, Arquette stated that he did not agree to turn over possession of his Datsun and that McKee became aggressive toward him. Arquette described one occasion where McKee and McKee's brother came to his house and assaulted one

2

of Arquette's guests. Arquette also described another occasion where McKee came to his house and asked him to move another truck to allow McKee access to the Datsun. Arquette stated that he had refused to move his truck and that he had warned McKee, "[I]f it's off my property, I'm gonna report it stolen." CP at 25. Arquette further stated that he had reported the Datsun stolen the following day when he came home from work and saw that it had been taken.

On March 29, 2009, Arquette called the police to report that a friend had told him the missing Datsun was "somewhere on the 200 . . . block of Cypress." CP at 28. Longview police officer Charles Meadows responded to the report and found the Datsun parked in McKee's carport. When Meadows found the Datsun, he noted that the truck was parked in plain sight with the correct license plates attached and that there was no damage to the truck's ignition or locks. Meadows called Arquette to tell him that the Datsun had been located and asked Arquette to pick up the vehicle; Arquette told Meadows that he was unable to pick up the truck and that he would make arrangements to pick it up later.

Later that same day, McKee called the police and asked why an officer had been behind his residence looking at the Datsun. Meadows arranged to speak with McKee in person at McKee's residence. When Meadows told McKee that the Datsun had been reported stolen, McKee became upset and told Meadows that the truck belonged to him. McKee showed Meadows the title to the Datsun, which contained a signature from Arquette appearing to release Arquette's ownership interest in the truck.

That same day, Meadows called Arquette and asked him to come to the Longview Police Department to speak with him. Arquette agreed to meet with Meadows on April 1, but he did

3

not show up on that date. Meadows again called Arquette on April 18, and after he did not receive an answer, went to Arquette's residence. Meadows asked Arquette about the Datsun's title and Arquette explained that he believed the title had been taken by Tribble, his former roommate.

Meadows asked Arquette to fill out a police statement form and left the form with Arquette. Arquette wrote the following on the form:

> [McKee] came by two or three times; one of those times I found out why he came over. He said he bought the truck off [Tribble], and then I told him it wasn't [Tribble's] to sell. Then he said that he paid a hundred and forty bucks for it, and I told him it wasn't for sale and if you [take] it off my property I was go[ing to] report it stolen, and he (sic) came home from work on a Friday, it was gone, so I reported it stolen.

CP at 14.[1] The police form, which Arquette signed, included a provision stating, "I have read the above statement; certify and declare it to be true and correct under the penalty of perjury under the laws of the State of Washington." CP at 127. Arquette left the signed statement in the door of his house, and Meadows retrieved the statement while Arquette was away at work.

---

[1] The record on appeal does not contain a copy of Arquette's signed police statement form and, instead, only contains testimony paraphrasing the statement. At trial, Longview Police Officer Meadows provided a similar, but not identical, description of Arquette's signed statement:

> That a person, [McKee], came by two or three times. One of the times, I found out why he was coming by. He said that he bought a truck off [Tribble], then I told him it was not [Tribble's] to sell, it was my truck. Then he said he had already paid for it, and, in parentheses he says a hundred and forty dollars, and he was going to take the truck. Then I told him if you take the truck, I will report the truck stolen.
>
> Then, on Thursday night, after I got off work and came home, he was here to get another truck that was his. On Friday evening when I came home from work my truck was gone, and I filed a police report on my truck.

CP at 127-28.

4

B.      Procedural

1. 2010 Second Degree Perjury Conviction and First Appeal

In October 2009, the State charged Arquette with two counts of second degree perjury. The first count related to Arquette's March 27 signed Longview Police Department Incident Report and the second count related to his April 18 signed police statement form. The trial court dismissed the first count,[2] and the second count was tried to a jury on May 5, 2010.

At Arquette's jury trial, McKee testified as stated above. The State also called Doyle Ash, who testified that he went with McKee and McKee's brother to Arquette's home to help tow away the Datsun. Ash stated that Arquette moved his truck to allow McKee access to the Datsun without incident. However, on cross examination Ash admitted that he did not clearly see Arquette on the day he helped to tow the Datsun and that he had been unable to identify Arquette in a photograph lineup when questioned by police.

Arquette testified that he had signed the Datsun's title on March 11, 2009, the day he received the title from United Finance after making his final payment for the truck. Arquette stated that he signed the title in anticipation of a pending sale to an individual in Kelso, Washington. Arquette further stated that he had placed the title on a dresser and that he suspected that Tribble had taken the title along with some of his other possessions.

Defense witness Greg Rupert testified that he was at Arquette's home when two men showed up and told Arquette that they were going to pick up the Datsun. Rupert stated that he heard Arquette tell the men, "I'll call the cops if you take it." CP at 155. Defense witness

---

[2] The record does not state the trial court's reasons for dismissing the first count.

5

Christopher Hawkins testified that he was at Arquette's home when McKee and McKee's

brother came over and demanded possession of the Datsun. Hawkins stated that McKee was

aggressive and that Arquette told McKee that the truck was not Tribble's to sell. Hawkins also

stated that he heard Arquette tell McKee that he would call the cops if McKee hauled the truck

away. The jury returned a verdict finding Arquette guilty of second degree perjury.

Arquette appealed his conviction to our court, asserting that "one of the trial court's jury

instructions incorrectly stated the law and lowered the burden of proof for perjury." *State v.

Arquette*, 162 Wn. App. 1025, 2011 WL 2464682 at *1 (Wash. App. Div 2).[3] His direct appeal

did not challenge the sufficiency of evidence used to convict him of second degree perjury. On

June 21, 2011, we affirmed Arquette's second degree perjury conviction in an unpublished

decision. *Arquette*, 162 Wn. App. 1025.

2. New 2011 First Degree Perjury Bench Trial Conviction and Direct Appeal

On December 10, 2010, while Arquette's appeal was still pending, the State filed a new

charge alleging that Arquette had committed first degree perjury based on his testimony at his

2010 trial on the second degree perjury charge. Arquette waived his jury trial right on the new

perjury charge and agreed to a bench trial. Arquette stipulated that he had

signed the title to the Datsun and that he had knowingly made the statements contained in his

2010 trial testimony. After reviewing a video of Arquette's 2010 trial and hearing arguments

---

[3] "This court may rely on unpublished opinions as evidence of the facts established in earlier proceedings in the same case or in a different case involving the same parties." *Martin v. Wilbert*, 162 Wn. App. 90, 93 n.1, 253 P.3d 108, *review denied*, 172 Wn.2d 1002, 268 P.3d 941 (2011) (citing *Island County v. Mackie*, 36 Wn. App. 391 n.3, 675 P.2d 607 (1984)).

from counsel, the trial court found Arquette guilty of first degree perjury. Arquette timely appealed this first degree bench trial perjury conviction on grounds that sufficient evidence did not support the conviction and that the conviction constituted double jeopardy.

3. PRP Challenge to 2010 Perjury Conviction; Consolidation with Direct Appeal of 2011 Conviction

On January 17, 2012, Arquette filed a PRP challenging his 2010 second degree jury trial perjury conviction on the grounds that sufficient evidence did not support the conviction and that his appellate counsel was ineffective for failing to raise a sufficiency challenge in his direct appeal. We consolidated Arquette's PRP with his direct appeal of his new conviction and remanded to the Cowlitz County Superior Court for entry of findings of fact and conclusions of law as required under CrR 6.1(d). The trial court entered its findings and conclusions on July 18, 2012. We now address Arquette's PRP challenge to his 2010 second degree perjury conviction and his direct appeal of his 2011 first degree perjury conviction.

ANALYSIS

I. PRP CHALLENGING 2010 SECOND DEGREE PERJURY CONVICTION

In his timely consolidated PRP, Arquette contends that sufficient evidence did not support his 2010 second degree perjury conviction. We agree, grant Arquette's PRP, and vacate his second degree perjury conviction. In light of the policy underlying the heightened standard of proof to support perjury convictions, we hold that to support a perjury conviction the independent corroborating evidence must be inconsistent with the defendant's innocence.

7

To obtain relief by means of a PRP, Arquette must establish either (1) constitutional error that caused actual and substantial prejudice to his case or (2) nonconstitutional error that caused a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-13, 792 P.2d 506 (1990). Here, Arquette alleges a constitutional error, asserting that the State failed to present sufficient evidence to support his second degree perjury conviction. *See In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011) ("A conviction based on insufficient evidence contravenes the due process clause of the Fourteenth Amendment and thus results in unlawful restraint.") (citing *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); RAP 16.4(c)(2)).

Sufficient evidence exists to support a conviction if any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the State. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A defendant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn from the evidence.[4] *State v. Salinas*, 119 Wn.2d 192,

---

[4] Arquette asserts in his opening brief that "the general rule that a sufficiency challenge admits the truth of the State's evidence and all reasonable inferences such that the evidence is viewed in the light most favorable to the State simply does not apply" in an appeal from a perjury conviction, citing *State v. Olson*, 92 Wn.2d 134, 135-36, 594 P.2d 1337 (1979). Br. of Appellant at 18. This is a misstatement of the law that ignores the following language in the *Olson* opinion: "A challenge to the sufficiency of the evidence admits the truth of the opposing party's evidence and all inferences which reasonably may be drawn from such evidence, and requires that the evidence be interpreted in the light most favorable to that party." *Olson*, 92 Wn.2d at 135-36.

201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

RCW 9A.72.030(1) provides:

> A person is guilty of perjury in the second degree if, in an examination under oath under the terms of a contract of insurance, or with intent to mislead a public servant in the performance of his or her duty, he or she makes a materially false statement, which he or she knows to be false under an oath required or authorized by law.

The requirements of proof in perjury cases are the strictest known to law, outside of treason. *State v. Olson*, 92 Wn.2d 134, 136, 594 P.2d 1337 (1979). In addition to the above elements, the State must present:

> 1. the testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath; *and*
> 2. another such direct witness or independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence.

*Olson*, 92 Wn.2d at 136 (emphasis added). The direct testimony required to support a perjury conviction "must come 'from someone in a position to know of his or her own experience that the facts sworn to by defendant are false.'" *State v. Singh*, 167 Wn. App. 971, 976, 275 P.3d 1156 (2012) (quoting *Nessman v. Sumpter*, 27 Wn. App. 18, 24, 615 P.2d 522 (1980)). The unique heightened standard of proof to support perjury convictions "reflects the underlying policy in Anglo-American jurisprudence of encouraging witnesses to testify freely without fear of reprisals." *Nessman*, 27 Wn. App. at 23-24 (citing 7 J. WIGMORE, EVIDENCE, §§ 2032 at 324, 2041 at 361 (1978)).

9

In asserting that the State failed to meet its burden to prove second degree perjury, Arquette does not contend that the State failed to present evidence in support of the essential elements of the charge as set forth in RCW 9A.72.030. Instead, Arquette argues that the State failed to meet its heightened burden of proof for a perjury conviction by failing to present the testimony of two credible direct witnesses[5] or a credible direct witness and sufficient corroborating evidence.

In response, the State first asserts that it met its burden by presenting the testimony of a direct witness, McKee, and a second direct witness, Ash. In his testimony, McKee stated that Arquette agreed to turn over possession of the Datsun, gave him the signed title, and assisted him in removing the Datsun from Arquette's property. McKee's testimony thus directly contradicted Arquette's signed statement to the police that his Datsun had been stolen. Accordingly, the State met its evidentiary burden of presenting "the testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath." *Olson*, 92 Wn.2d at 136.

However, nothing contained in Ash's testimony directly contradicted Arquette's signed police statement and, thus, is insufficient to sustain Arquette's second degree perjury conviction. Although Ash testified consistently with McKee, he was unable to positively identify Arquette as the person present at Ash's home when McKee took possession of the Datsun pickup truck. Moreover, Ash had no direct knowledge of the circumstances surrounding the conflict over

---

[5] Although Arquette appears to concede in his PRP that the State presented sufficient evidence of one credible witness in the form of McKee's testimony, his supplemental brief addressing the trial court's findings and conclusions asserts that McKee's testimony did "not constitute the requisite 'directly contradictory testimony.'" *See* PRP at 7; Suppl. Br. of Appellant at 5.

ownership of the Datsun and, thus, was not "'in a position to know of his . . . own experience that the facts sworn to by [Arquette were] false.'" *See Singh*, 167 Wn. App. at 976 (quoting *Nessman*, 27 Wn. App. at 24). Because Ash's direct testimony was insufficient to support the State's heightened burden of proof in a second degree perjury conviction, we turn to whether the State presented sufficient "independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome [Arquette's oath] and the legal presumption of his innocence." *Olson*, 92 Wn.2d at 136.

At the outset of our analysis, we note that there is scant Washington law discussing the standard by which corroborating evidence may support a perjury conviction. More to the point, there is no Washington case that squarely addresses whether such independent corroborating evidence must merely support the direct witness's testimony in any manner or whether such evidence must also be inconsistent with the innocence of the defendant.

In *State v. Rutledge*, our Supreme Court noted that such corroborating evidence "need not equal in weight the testimony of a second witness." 37 Wash. 523, 527, 79 P. 1123 (1905). The corroborating evidence, though, "'must be clear and positive and so strong that, with the evidence of the witness who testifies directly to be the falsity of the defendant's testimony, it will convince the jury beyond a reasonable doubt.'" *Rutledge*, 37 Wash. at 527 (quoting H.C. UNDERHILL, CRIMINAL EVIDENCE § 468); 7 WHARTON'S CRIMINAL EVIDENCE § 387 (9th ed.). Additionally, in *State v. Buchanan*, our Supreme Court held, "Admissions and contradictory statements of the defendant, even though not made under oath, are sufficient, given in corroboration of the single witness to satisfy the quantum of evidence required to support a conviction of perjury." 79 Wn.2d 740, 745, 489 P.2d 744 (1971) (citing *United States v.*

11

*Goldberg*, 290 F.2d 729, 733, 744 (2d Cir. 1961); *People v. Sagehorn*, 140 Cal. App.2d 138, 294

P.2d 1062 (1956); 70 C.J.S. PERJURY § 70c(3), at 541 (1951); 41 AM. JUR. PERJURY § 69, at 38

(1942)). With sparse Washington case law on the issue, we examine also several federal cases

addressing the nature of independent corroborating evidence to support a perjury conviction.

In *United States v. Neff*, 212 F.2d 297, 306-07 (3d Cir. 1954), the Third Circuit Court of

Appeals noted,

> To sustain a conviction for perjury the evidence must be strong, clear, convincing
> and direct. Where the government seeks to establish perjury by the testimony of
> one witness and cor[r]oborating evidence, the latter must be independent of the
> former and inconsistent with the innocence of the defendant.

(Internal footnotes omitted.) Citing to *Neff*, the Fifth Circuit Court of Appeals has similarly held

that independent corroborating evidence in support of a perjury conviction must be "'inconsistent

with the innocence of the defendant.'" *Paternostro v. United States*, 311 F.2d 298, 308 (5th Cir.

1962), *abrogated on other grounds by Brogan v. United States*, 522 U.S. 398, 118 S. Ct. 805,

139 L. Ed. 2d 830 (1998). In *United States v. Buckner*, 118 F.2d 468, 469 (2d Cir. 1941), the

Second Circuit Court of Appeals also endorsed the requirement that independent corroborating

evidence be inconsistent with the defendant's innocence to support a perjury conviction, but has

since clarified

> the . . . rule requiring that the independent corroborating evidence be 'inconsistent
> with the innocence of the defendant' to mean no more than that such evidence
> must tend to substantiate that part of the testimony of the principal prosecution
> witness which is material in showing that the statement made by the accused
> under oath was false.

*United States v. Weiner*, 479 F.2d 923, 927-28 (2d Cir. 1973).

The remaining federal circuit courts addressing this issue are split on the nature of the

required corroborating evidence to support a perjury conviction. *See, e.g., United States v.*

*Erhardt*, 381 F.2d 173, 174 (6th Cir. 1967) ("This court has held that to support a perjury conviction the testimony of a single witness must be corroborated by circumstances inconsistent with the innocence of the accused."); *Arena v. United States*, 226 F.2d 227, 236 (9th Cir. 1955) ("It is sufficient if the corroborating evidence tends to establish the defendant's guilt and if such evidence together with the direct evidence is 'inconsistent with the innocence of the defendant.'"); *Brightman v. United States*, 386 F.2d 695 (1st Cir. 1967) (adopting test in *Arena*).

Following *Neff* and cases in accord with *Neff*, we hold that when the State relies on independent corroborating evidence together with the testimony of a direct witness to support a perjury conviction, such corroborating evidence must be inconsistent with the defendant's innocence. To hold otherwise would risk sustaining a perjury conviction merely upon the testimony of a single witness, uncorroborated by any other witness's testimony or by evidence of circumstances inconsistent with the defendant's innocence. Such a result diminishes the heightened standard of proof required for a perjury conviction and contravenes the well-established rule that "the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused" in a prosecution for perjury. *Hammer v. United States*, 271 U.S. 620, 626, 46 S. Ct. 603, 70 L. Ed. 1118 (1926).

Having determined that corroborating evidence must be inconsistent with the innocence of the defendant to support a perjury conviction, we turn to evidence presented in this case. The State argues that the following facts were sufficient to meet the independent corroborating evidence standard: (1) McKee's possession of the signed title to the Datsun, (2) the manner in which the Datsun was stored in McKee's carport, (3) McKee's inquiry to the police asking why an officer was looking at the Datsun, and (4) Arquette's conduct in failing to retrieve the Datsun

13

after Meadows informed him that it had been located. Although this evidence corroborated McKee's testimony that Arquette freely turned over possession of the Datsun to him, it was also not inconsistent with Arquette's innocence and is thus insufficient to support his second degree perjury conviction.

The statement upon which the State relied to prosecute Arquette for second degree perjury provided:

> [McKee] came by two or three times; one of those times I found out why he came over. He said he bought the truck off [Tribble], and then I told him it wasn't [Tribble's] to sell. Then he said that he paid a hundred and forty bucks for it, and I told him it wasn't for sale and if you took it off my property I was go[ing to] report it stolen, and he (sic) came home from work on a Friday, it was gone, so I reported it stolen.

CP at 14. The manner in which the Datsun was stored and McKee's inquiry into why the police were looking at the vehicle do tend to show that McKee believed he rightfully had possession of the truck. However, this evidence was also consistent with Arquette's police statement, in which he stated that McKee believed he had purchased the vehicle from Tribble despite Arquette's claims that the truck belonged to him. Similarly, evidence related to the signed vehicle title was not inconsistent with Arquette's innocence because he maintained that he had previously signed the title in anticipation of a sale to someone else and that the title had been taken from his room, likely by Tribble. Finally, evidence of Arquette's failure to immediately retrieve the vehicle was also not inconsistent with his innocence because the evidence at trial showed that the vehicle was not in running order and would be a burden to retrieve given Arquette's work schedule and the relatively low value of the vehicle. Because the State's corroborating evidence was not inconsistent with Arquette's innocence, it was insufficient to support his second degree perjury conviction. Accordingly, we grant Arquette's PRP; vacate his 2010 second degree perjury

14

conviction, and remand to the trial court to dismiss the 2009 second degree perjury charge with prejudice.[6]

## II. DIRECT APPEAL OF 2011 FIRST DEGREE PERJURY CONVICTION

Next, Arquette contends that sufficient evidence does not support his 2011 conviction for first degree perjury. For the reasons stated in our above analysis, we agree and vacate his first degree perjury conviction as well.

The basis for the State's charges against Arquette for first degree perjury arose from the following sworn testimony at his first trial, to which Arquette stipulated at his second trial that he had knowingly made:

> [Defense counsel]: Did you read through [the stolen vehicle waiver] before you signed it?
> [Arquette]: Yeah.
> [Defense counsel]: And you signed it?
> [Arquette]: Yeah.
> [Defense counsel]: Freely and voluntarily?
> [Arquette]: Yeah.
> [Defense counsel]: Why is that?
> [Arquette]: Because my truck was stolen.

CP at 13-14.

RCW 9A.72.020(1) provides, "A person is guilty of perjury in the first degree if in any official proceeding he or she makes a materially false statement which he or she knows to be false under an oath required or authorized by law." As was required to support a conviction for second degree perjury, to support a first degree perjury conviction the State must also have presented:

---

[6] Because we hold that sufficient evidence did not support Arquette's second degree perjury conviction, we need not address his ineffective assistance of appellate counsel claim for failing to raise the sufficiency issue in his direct appeal.

15

    1. the testimony of at least one credible witness which is positive and directly contradictory of the defendant's oath; and

    2. another such direct witness or independent evidence of corroborating circumstances of such a character as clearly to turn the scale and overcome the oath of the defendant and the legal presumption of his innocence.

*Olson*, 92 Wn.2d at 136.

The State argues that the same evidence it cited in support of Arquette's second degree perjury conviction supports his first degree perjury conviction, specifically the direct testimony of McKee and Ash or, in the alternative, McKee's direct testimony together with corroborating evidence showing that the Datsun had not been stolen. As we explained above, Ash's testimony was insufficient to meet the standard required to support a perjury conviction because he was not in a position to know whether Arquette's sworn testimony that his truck had been stolen was false. *See Singh*, 27 Wn. App. at 976. As also explained, the State's corroborating evidence was insufficient to meet the standard required to support a perjury conviction because it was not inconsistent with Arquette's innocence. Accordingly, we reverse Arquette's first degree perjury conviction.[7]

We grant Arquette's PRP, reverse both his 2010 second degree perjury conviction and the 2011 first degree perjury conviction, and remand to the trial court to dismiss both charges with

---

[7] Because we reverse Arquette's first degree perjury conviction for lack of sufficient evidence, we need not address his double jeopardy argument.

16

No. 42546-7-II (Cons. With
  No. 42974-8-II)

prejudice.

BJORGEN, J.

We concur:

HUNT, P.J.

PENOYAR, J.