[No. 42926-8-II.   Division Two.   April 28, 2015.]

*In the Matter of the Personal Restraint of* TOMMY LEE CROW, JR., *Petitioner.*

416

*Christopher Gibson* (of *Nielsen Broman & Koch PLLC*), for petitioner.

*Jon Tunheim, Prosecuting Attorney,* and *Carol L. La Verne* and *James C. Powers, Deputies,* for respondent.

¶1 WORSWICK, J. — In this personal restraint petition (PRP), Tommy Crow Jr. petitions us to vacate his two second degree murder convictions and, alternatively, to

modify his aggravated sentence. Crow raises numerous arguments, claiming (1) sentencing errors, (2) prosecutorial misconduct, (3) ineffective assistance of counsel, and (4) erroneous jury instructions. In the published portion of this opinion, we hold that the evidence was insufficient to support the good Samaritan aggravator and that the trial court erred by explicitly considering good time credits when sentencing Crow. In the unpublished portion of this opinion, we reject the remainder of Crow's arguments. Accordingly, we grant Crow's petition in part by vacating his sentence on both counts and remanding for resentencing. We deny the remainder of Crow's petition.

## FACTS

¶2 On March 28, 2008, at a homeless campsite in Olympia, Washington, Tommy Crow, Bryan Eke, and Christopher Durga murdered David Miller and Norman Peterson. On March 18, Miller had reported to law enforcement that he witnessed Eke and Durga assault Scott Cover on March 7. On March 27, Durga learned law enforcement had information inculpating him in Cover's assault.

¶3 On March 28, the night of Miller's murder, Crow, Eke, and Durga went to Miller's campsite. Crow struck Miller in the face, and Durga put Miller in a choke hold until he was incapacitated. Durga then dragged Miller's body into the campsite fire and stood on his back.

¶4 When Peterson arrived at Miller's camp and saw Miller's body in the fire, Crow struck Peterson in the head with a tree branch and put him in a choke hold until he was incapacitated. Crow then threw Peterson's body into the campsite fire with Miller's. A medical examiner later determined that Miller and Peterson died by strangulation.

¶5 The State charged Crow with two counts of second degree murder, each with a separate sentencing aggravator:

a good Samaritan sentencing aggravator[1] for murdering Miller in retaliation for reporting Cover's assault to law enforcement and a deliberate cruelty sentencing aggravator[2] for Peterson's murder. Each murder count included the alternative means of intentional murder and felony murder (with second degree assault as the predicate felony). The State charged Crow as both an accomplice and a principal. The State also charged Crow with second degree arson.

¶6 A jury found Crow guilty as charged. On the special verdict forms, the jury answered yes to both sentencing aggravators.

¶7 At sentencing, the State recommended an exceptional sentence of 300 months' imprisonment for each second degree murder charge, to be served consecutively, for a combined total of 600 months' imprisonment. The trial court asked the State, "[W]hat credit for good time in the future will [Crow] be eligible to receive that would subtract from the sentence that you've recommended here?" Verbatim Report of Proceedings (VRP) (Sentencing) at 1451. The State responded, "On [the two murder charges, Crow] would receive a maximum of ten percent only for good time." VRP (Sentencing) at 1451.

¶8 Crow's counsel made no sentencing argument on Crow's behalf, instead stating, "Your honor, I don't really have much to say. I think we lost any chance of influencing this court's decision with respect to sentencing when this case went to trial." VRP (Sentencing) at 1476. Trial counsel stated a total of three times that he had lost any chance of influencing the trial court's sentencing decision after the case went to trial.

¶9 For Miller's murder, the trial court imposed a 360-month exceptional sentence based on the good Samaritan aggravating factor. For Peterson's murder, the trial court

---

[1] RCW 9.94A.535(3)(w).

[2] RCW 9.94A.535(3)(a).

imposed a 300-month exceptional sentence, based on the deliberate cruelty aggravating factor. Because these were serious violent offenses, the trial court ordered these two sentences to be served consecutively,[3] resulting in a total sentence of 660 months' imprisonment.[4]

¶10 Regarding Crow's sentence, the trial court said:

I've gone above the amount requested by the prosecutor or suggested by the prosecutor as appropriate in this case, and I've differentiated between the amount of time imposed for [the two murder counts].

. . . .

The reason that I've differentiated between the two sentences is . . . [Miller's act of reporting the assault to law enforcement] was an act of extraordinary bravery, in my estimation, and the exceptional sentence that I've imposed here reflects that determination.

VRP (Sentencing) at 1482-84. The trial court also reiterated that it considered good time credits in determining Crow's sentence:

With the imposition of this sentence, Mr. Crow, you will serve, even with a good time credit, a full 50 years of incarceration.

VRP (Sentencing) at 1483.

¶11 In its written order, the trial court ruled:

The [two aggravating factors] listed in the preceding paragraph, taken together or considered individually, constitute sufficient cause to impose the total of 660 months for the exceptional consecutive sentences for [Crow's two murder convictions]. This court would impose the same total exceptional penalty for those consecutive sentences if only one of the grounds listed in the preceding paragraph is valid.

Clerk's Papers at 100.

---

[3] RCW 9.94A.589(1)(b); *see* former RCW 9.94A.030(41)(a)(iii) (2006).

[4] The trial court also sentenced Crow to 43 months' imprisonment for the arson, to be served concurrently with the two murder sentences.

¶12 We affirmed Crow's convictions on direct appeal in an unpublished opinion. On direct appeal, appellate counsel did not challenge the consideration of good time credits, the good Samaritan aggravator, or any sentencing issue. Crow then filed this PRP.

## ANALYSIS

¶13 A PRP is not a substitute for a direct appeal. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 824, 650 P.2d 1103 (1982). We are reluctant to overturn a settled judicial decision where the petitioner has already had an opportunity for appeal. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 676, 327 P.3d 660 (2014). Accordingly, there are limits on the use of a PRP to collaterally attack a criminal offender's restraint. *Hagler*, 97 Wn.2d at 824.

¶14 A PRP must state with particularity the factual allegations that, if proved, would entitle the petitioner to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Further, the factual allegations must have evidentiary support. 118 Wn.2d at 886. If the record does not support the factual allegations, then the petitioner must show through affidavits or other forms of corroboration that competent and admissible evidence will establish the factual allegations. 118 Wn.2d at 886.

¶15 Once the petitioner states in his petition the facts underlying the claim of unlawful restraint and the evidence supporting these allegations, we then examine the State's response. 118 Wn.2d at 886. "The State's response must answer the allegations of the petition and identify all material disputed questions of fact." 118 Wn.2d at 886. If answering the petitioner's allegation requires reference to another proceeding's record, the State must include a copy of that record's relevant parts. RAP 1.2(b), 16.9(a); *see In re Pers. Restraint of Reise*, 146 Wn. App. 772, 780, 192 P.3d 949 (2008).

¶16 To be entitled to collateral relief through a PRP the petitioner must prove error "by a preponderance of the

evidence." *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 490, 251 P.3d 884 (2010). If the petitioner is able to show error, he is also required to prove prejudice, the degree of which depends on the type of error shown. To be entitled to relief for a constitutional error, the petitioner must also prove by a preponderance of the evidence that the error caused actual and substantial prejudice. *Cross*, 180 Wn.2d at 676. Actual and substantial prejudice, which "must be determined in light of the totality of circumstances," exists if the error "so infected petitioner's entire trial that the resulting conviction violates due process." *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985). To be entitled to relief for a nonconstitutional error, the petitioner must prove by a preponderance of the evidence that the error caused a fundamental defect resulting in a complete miscarriage of justice. *Cross*, 180 Wn.2d at 676; *Monschke*, 160 Wn. App. at 490-91.

## I. INSUFFICIENT EVIDENCE SUPPORTS MILLER'S GOOD SAMARITAN STATUS

¶17 Crow first argues that the evidence is insufficient to support the good Samaritan aggravator on Miller's murder. Crow argues Miller's act of reporting the assault of Cover to law enforcement a week after the assault occurred, and two weeks before Miller was murdered, did not make Miller a "good Samaritan" because Miller was not harmed while providing immediate aid to someone in peril. Suppl. Br. of Pet'r at 9. The State argues that even if we determine the evidence was insufficient, Crow failed to show actual and substantial prejudice because the trial court explicitly stated the total sentence for both murders would be the same with only one of the two sentencing aggravators. We agree with Crow.

¶18 A defendant's assertion of insufficient evidence asserts a constitutional error. *State v. Arquette*, 178 Wn. App. 273, 281, 314 P.3d 426 (2013). Thus, Crow must

demonstrate actual and substantial prejudice to prevail. *Cross*, 180 Wn.2d at 676.

■ ¶19 Substantial evidence must support a sentencing aggravator that allows the trial court to impose an exceptional sentence. *See State v. Gordon*, 172 Wn.2d 671, 680-81, 260 P.3d 884 (2011); *In re Pers. Restraint of Howerton*, 109 Wn. App. 494, 502, 36 P.3d 565 (2001). We review claims of insufficient evidence to determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

■■ ¶20 We review questions of statutory interpretation de novo, interpreting statutes to give effect to the legislature's intent. *State v. Bunker*, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010). When construing a statute, we first examine the statute's plain meaning. 169 Wn.2d at 578. We determine a statute's plain meaning from the ordinary meaning of its language, as well as from the statute's general context, related provisions, and the statutory scheme as a whole. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005).

¶21 Where the meaning of statutory language is plain on its face, we give effect to that plain meaning as an expression of legislative intent. *See State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2011). But if after conducting a plain meaning review, the statute is still susceptible to more than one interpretation, then we may rely on statutory construction, legislative history, and relevant case law to determine legislative intent. 172 Wn.2d at 242.

¶22 Under RCW 9.94A.535(3)(w), the trial court may exceed the standard sentencing range where "[t]he defendant committed the offense against a victim who was acting as a good [S]amaritan." No definition of "good Samaritan" appears in the statute. RCW 9.94A.535(3)(w). Nothing from the statute's general context, related provisions, or the statutory scheme as a whole provides insight into whether

the legislature intended to limit the term "good Samaritan" to those harmed while providing immediate aid to another, or intended to expand the term's meaning to include any victim whose good deed directly caused his victimization. Thus, RCW 9.94A.535(3)(w)'s term "good Samaritan" is susceptible to more than one interpretation and we rely on statutory construction, legislative history, and relevant case law to determine legislative intent.

¶23 When passing RCW 9.94A.535(3)(w), the legislature intended to codify the common law good Samaritan sentencing aggravator. *State v. Siers*, 158 Wn. App. 686, 690, 244 P.3d 15 (2010), *overruled on other grounds,* 174 Wn.2d 269, 274 P.3d 358 (2012); Laws of 2005, ch. 68, §§ 1, 3 (the bill that codified the good Samaritan sentencing aggravator and stated, "The legislature intends . . . to codify existing common law aggravating factors, without expanding or restricting existing statutory or common law aggravating circumstances"); *see also* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.32 (3d ed. 2008). In *State v. Hillman,* Division One of this court stated that the common law good Samaritan aggravator was supported by the legislature's concern with protecting bystanders so as "to prevent an innocent person from being injured without the assistance of bystanders," because "to murder a person *who comes to one's aid* discourages others from *offering aid* to persons in need of help." 66 Wn. App. 770, 776, 832 P.2d 1369 (1992) (emphasis added).

¶24 Civil cases have also addressed the definition of "good Samaritan." In *Butzberger v. Foster,* the lead opinion noted that "[t]he law has long recognized that seeing a person injured or in peril compels those called to follow the example of the Good Samaritan to provide *assistance.*" 151 Wn.2d 396, 412, 89 P.3d 689 (2004) (emphasis added). In *Gardner v. Loomis Armored, Inc.,* our Supreme Court stated that a person became a good Samaritan "by voluntarily risking his own life and *aiding* a helpless victim of

crime."[5] 128 Wn.2d 931, 946, 913 P.2d 377 (1996) (emphasis added).

¶25 We hold the legislature intended RCW 9.94A-.535(3)(w)'s term "good Samaritan" to refer to *bystanders* who are harmed while providing immediate aid to someone in peril. Because Miller reported the assault of Cover to law enforcement over a week after Cover was assaulted and over two weeks before Miller was murdered, Miller was not harmed while providing immediate aid to someone in peril. *See Hillman,* 66 Wn. App. at 776. Thus, we hold that insufficient evidence supports the good Samaritan aggravator because Miller's act of reporting Cover's assault to the police over a week after it occurred, while admirable, did not make Miller a good Samaritan under RCW 9.94A-.535(3)(w). Thus, Crow has proved error.

¶26 Crow has also proved that this error caused him actual and substantial prejudice. Here, the good Samaritan aggravator applied only to Miller's murder. Thus, without the good Samaritan aggravator, the trial court could not have imposed an exceptional sentence above the standard range for Miller's murder. Assuming without deciding that the trial court would have increased the exceptional sentence for Peterson's murder to compensate for its inability to impose an exceptional sentence for Miller's murder, this would not have removed the actual and substantial prejudice Crow suffered by the increased sentence for Miller's

---

[5] The State cites *State v. Hooper* for the argument that reporting crimes to the police is included in the definition of "good Samaritan." 100 Wn. App. 179, 185, 997 P.2d 936 (2000). But *Hooper* is distinguishable from this case for two reasons. First, the *Hooper* court recognized that under the law as it stood at the time, the statutory list of aggravating factors was "illustrative only" and the defendant's conduct did not need to "precisely fit within one of the factors." 100 Wn. App. at 185. But this was no longer the law after the legislature amended the statute in 2005. *Compare* former RCW 9.94A.535 (2003), *with* former RCW 9.94A.535(3) (2005). Second, the victim in *Hooper* was a bystander who was calling 911 to report a crime as it was occurring, whereas the victim in this case reported a crime a week after its occurrence. 100 Wn. App. at 181-82.

murder. Thus, Crow has shown actual and substantial prejudice as to Miller's murder.[6]

## II. Erroneous Consideration of Good Time Credits

¶27 Crow next argues that the trial court erred by explicitly considering good time credits when determining his sentence on both murders. Again, we agree.

¶28 By arguing that the trial court's sentence exceeded its statutory authority under the Sentencing Reform Act of 1981[7] (SRA), Crow asserts a nonconstitutional error. *See In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 867-68, 50 P.3d 618 (2002). Thus, to be entitled to relief, Crow must prove by a preponderance of the evidence that the error caused a fundamental defect resulting in a complete miscarriage of justice. *Cross*, 180 Wn.2d at 676; *Monschke*, 160 Wn. App. at 490-91. A sentence in excess of the trial court's statutory authority under the SRA constitutes a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of West*, 154 Wn.2d 204, 213, 110 P.3d 1122 (2005); *Goodwin*, 146 Wn.2d at 867-68.

¶29 Under the SRA, the trial court may not consider a defendant's potential good time credits when imposing an exceptional sentence.[8] *State v. Wakefield*, 130 Wn.2d 464, 477-78, 925 P.2d 183 (1996). Here, it is clear that the trial court improperly considered Crow's potential credits. The

---

[6] The State argues that Miller is a good Samaritan because by reporting Cover's assault to law enforcement, he helped the local homeless community. The State's argument fails because we hold the term "good Samaritan" refers to those harmed while providing *immediate* aid to someone in peril, and reporting a crime to help the community is not providing immediate aid to someone in peril. We also note that accepting the State's argument would strain the limits of due process by extending the good Samaritan aggravator to a defendant who victimized anyone doing anything that arguably provided a benefit to society.

[7] Ch. 9.94A RCW.

[8] The State asks us to hold that while considering good time credits in determining *whether* to impose an exceptional sentence is impermissible, considering good time credits in determining an exceptional sentence's *length* is permissible. But the case law does not support this distinction. " 'The framework of the SRA [Sentencing Reform Act of 1981] indicates that earned early release

trial court asked the State, "[W]hat credit for good time in the future will [Crow] be eligible to receive that would *subtract* from the sentence that you've recommended here?" VRP (Sentencing) at 1451 (emphasis added). The State said that good time credits could reduce Crow's sentence for the two murders by a maximum of 10 percent. VRP (Sentencing) at 1451. Following this exchange, the trial court sentenced Crow to a sentence that was 10 percent greater than the State's recommendation, stating, "With the imposition of this sentence, Mr. Crow, you will serve, even with a good time credit, a full 50 years of incarceration." VRP (Sentencing) at 1483. Thus, because Crow has shown that the trial court exceeded its authority under the SRA by considering future good time credits when sentencing him, Crow has shown a fundamental defect resulting in a complete miscarriage of justice. *West*, 154 Wn.2d at 213; *Goodwin*, 146 Wn.2d at 867-68.

¶30 Because the evidence was insufficient to support the good Samaritan aggravator and the trial court erred by explicitly considering good time credits when sentencing Crow, we grant Crow's petition in part by vacating his sentence on both counts and remanding for resentencing.

¶31 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MELNICK and SUTTON, JJ., concur.

Review denied at 185 Wn.2d 1002 (2016).

---

time is to be considered only after the offender has begun serving his sentence. Moreover, it would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement.' " *State v. Wakefield*, 130 Wn.2d 464, 478, 925 P.2d 183 (1996) (alteration in original) (citation omitted) (quoting *State v. Fisher*, 108 Wn.2d 419, 429 n.6, 739 P.2d 683 (1987)).