IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) ) | No. 82929-7-I |
| CHARLES E. PILLON, | ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) ) ) | |

PER CURIAM — Charles Pillon was convicted in King County Superior Court Cause No. 16-1-05983-6 KNT of unlawfully dumping solid waste without a permit in violation of former RCW 70.95.240 (2011), now codified at RCW 70A.205.195.[1] In this personal restraint petition, Pillon challenges the litter cleanup restitution payment the trial court ordered him to pay pursuant to that statute. The State has filed a response, and Pillon has filed a reply.[2] For the reasons below, we deny the petition.

## FACTS

The following background facts are taken from this court's opinion in Pillon's direct appeal, State v. Pillon, 11 Wn. App. 2d 949, 459 P.3d 339 (2020):

---

[1] Because the statute was recodified without any relevant changes to its text, we refer hereinafter to the current statute.

[2] Pillon has also filed a "Petitioner's Supplement to Earlier Response" (Supplement), which we have also considered.

In 1977, Charles Edwin Pillon purchased a 10-acre parcel of property on Renton Issaquah Road Southeast in unincorporated King County. Pillon has lived on the property since 1979.

Pillon used "a large portion of the property to store, collect, accumulate, and dispose of various items of solid waste." Pillon allowed members of the public to leave solid waste and vehicles on his property in exchange for a "tipping fee." Between February 25, 2015 and February 25, 2016, Pillon " 'put the word out' " to the community "that people could dump solid waste" on his property. Pillon would also "collect solid waste to bring back to his property." Pillon admitted to "receiving onto his property approximately 120 cubic yards of solid waste per month." In exchange for assisting Pillon in collecting the tipping fees and working on his property, Pillon allowed "individuals to live in the used motor homes and recreational vehicles." The individuals would move "items of solid waste into the areas of the property where" that type of item was "stored and/or disposed," collect "recyclable materials," and remove "metals from the vehicles and solid waste brought onto the property" to be "sold as scrap." The parts and materials removed from the vehicles, boats, and boat trailers were "sorted and placed into a collection 'tub' " and sold as scrap.

On March 27, 2015, Washington State Patrol (WSP) aircraft videotaped the condition of the property. A screenshot from the videotape shows solid waste "stored and/or disposed" in three different areas on the property: a bus and recreational vehicle (RV) area, a workshop area, and a landfill area.

Pillon did not have a permit or license to store or dispose of solid waste or hazardous waste. Storm water and groundwater from Pillon's property drains into nearby May Creek and "ultimately, to Lake Washington."

On December 3, 2015, Seattle and King County Public Health (SKCPH) issued a notice of violation to Pillon for the collection and disposal operation. On January 11, 2016, WSP aircraft took another video of the property.

WSP obtained a warrant to search the Pillon property on February 25, 2016. WSP Trooper Troy Giddings executed the warrant to search the property. Washington State Department of Ecology (WDOE) and United States Environmental Protection Agency (USEPA) employees took photographs and obtained random samples for testing from the soil

and the containers located in the "Bus/RV" area, the workshop area, and the landfill area.

There were "[a]pproximately 2,000 containers" located on Pillon's property and it was "impossible to determine how many containers could be buried under solid waste piles." The agency employees selected 9 containers from the three different areas "in an effort to randomize the sample as much as possible to provide a fair representation of the types, location, and condition of the various containers" on the property.

Laboratory tests identified high levels of arsenic, cadmium, and chromium in the soil samples and characteristics of ignitability in the container samples from the Bus/RV area. Soil and container samples from the workshop area contained high levels of lead, arsenic, cadmium, and chromium. Soil samples from the landfill area contained high levels of arsenic and chromium.

Pillon, 11 Wn. App. 2d at 953-55.

The State charged Pillon with one count of violating the Hazardous Waste Management Act, ch. 70.105 RCW, one count of wrecking vehicles without a license and with a prior conviction, and one count of unlawfully dumping solid waste.[3] The parties entered into a pretrial stipulation in which Pillon stipulated that he "allow[ed] members of the public to deposit solid waste at his property," "estimate[d] that he accepts approximately 120 cubic yards per month onto his property,'" and that "[t]his estimate includes the timeframe between February 25, 2015, and February 25, 2016."[4]

---

[3] "Solid waste" is defined as "all putrescible and nonputrescible solid and semisolid wastes including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction wastes, abandoned vehicles or parts thereof, and recyclable materials." Former RCW 70.95.030(22) (2010), recodified as RCW 70A.205.015(22) (LAWS OF 2020, ch. 20, § 1161).

[4] Joint Response to PRP, App. D at 001.

The parties agreed that the stipulated facts "are true and may be considered by the court as undisputed evidence in this case."[5]

The trial court found Pillon guilty as charged following a bench trial. It later ordered Pillon to pay a litter cleanup restitution payment (litter payment) of $3,888,000.00 pursuant to RCW 70A.205.195(3)(c)(ii), which provides, "A person found to have littered in an amount greater than one cubic yard shall . . . pay a litter cleanup restitution payment. This payment must be the greater of twice the actual cost of removing and properly disposing of the litter, or one hundred dollars per cubic foot of litter." The actual cost to remove and dispose of the solid waste on Pillon's property was unknown at the time, so the trial court based the $3,888,000.00 litter payment on Pillon's stipulation to accepting 120 cubic yards per month of solid waste during the one-year charging period.[6]

Pillon filed a direct appeal challenging his convictions, this court affirmed, the Washington Supreme Court denied review, see 195 Wn.2d at 1031, and this court issued its mandate on September 4, 2020. In July 2021, Pillon filed this timely personal restraint petition seeking to vacate the litter payment.

---

[5] Id. at 002.

[6] 120 cubic yards per month, multiplied by 12 months, equals 1,440 cubic yards. 1,440 cubic yards, multiplied by 27 cubic feet per cubic yard, equals 38,880 cubic feet accepted during the one-year charging period. That figure, multiplied by the statutory rate of $100.00 per cubic foot of litter, equals $3,888,000.00.

ANALYSIS

Pillon contends that the litter payment was imposed in violation of Brady[7] and related government misconduct principles and that it violates the Eighth Amendment's prohibition on excessive fines. To be entitled to collateral relief, a petitioner must prove error by a preponderance of the evidence. In re Pers. Restraint of Crow, 187 Wn. App. 414, 420-21, 349 P.3d 902 (2015) (quoting In re Pers. Restraint of Monschke, 160 Wn. App. 479, 490, 251 P.3d 884 (2010)). And, "[t]o be entitled to relief for a constitutional error, the petitioner must also prove by a preponderance of the evidence that the error caused actual and substantial prejudice." Crow, 187 Wn. App. at 421 (citing In re Pers. Restraint of Cross, 180 Wn.2d 664, 676, 327 P.3d 660 (2014)). "In order to meet this burden, the petitioner 'must support the petition with facts or evidence and may not rely solely on conclusory allegations.' " In re Pers. Restraint of Griffin, 181 Wn. App. 99, 104, 325 P.3d 322 (2014) (quoting Monschke, 160 Wn. App. at 488). "Further, the petitioner has the burden of demonstrating 'that the factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.' " Griffin, 181 Wn. App. at 104 (internal quotation marks omitted) (quoting Monschke, 160 Wn. App. at 489).

Pillon fails to satisfy the foregoing standards.

Pillon first contends that relief is warranted because the State violated Brady and committed misconduct by failing to "act upon" exculpatory evidence that the materials on Pillon's property were benign—not hazardous. But as further discussed below with regard to Pillon's excessive fines claim, Pillon's assertions that any such exculpatory

---

[7] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

evidence exists are too conclusory to warrant relief. And in any event, the statute Pillon was convicted of violating and that governs the imposition of the litter payment makes no reference to the hazardousness (or nonhazardousness) of the solid waste involved. Instead, it directs that the litter payment "must be" the greater of (1) twice the actual cost of removal and disposal and (2) $100 per cubic foot of litter. RCW 70A.205.195(3)(c)(ii). Here, Pillon stipulated that he accepted approximately 120 cubic yards of solid waste per month during the one-year charging period, for a total of 38,880 cubic feet. Furthermore, at the hearing to set the amount of the litter payment, the State presented evidence that the actual volume of solid waste on Pillon's property was an order of magnitude greater. In light of the foregoing, Pillon cannot establish that he was actually and substantially prejudiced by the State's alleged suppression of or failure to act on exculpatory evidence of the nature of the waste on Pillon's property.

Pillon next contends that the litter payment violates the Eighth Amendment's prohibition on excessive fines. "The excessive fines clause 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.' " City of Seattle v. Long, 198 Wn.2d 136, 159, 493 P.3d 94 (2021) (internal quotation marks omitted) (quoting Austin v. United States, 509 U.S. 602, 609-10, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993)). Here, the State appears to concede that the litter payment is a "fine" for purposes of the excessive fines clause. See Long, 198 Wn.2d at 163 (sanction must be partially punitive to constitute a fine).

A fine is unconstitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." Long, 198 Wn.2d at 166 (citing United States v. Bajakajian,

524 U.S. 321, 336, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1988)). Washington courts apply the Ninth Circuit's test to determine whether a fine is grossly disproportional. Long, 198 Wn.2d at 167. "The test includes but is not limited to '(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused.' " Long, 198 Wn.2d at 167 (internal quotation marks omitted) (quoting State v. Grocery Mfrs. Ass'n, 195 Wn.2d 442, 476, 461 P.3d 334 (2020)).

Pillon does not meaningfully address the foregoing test. He does appear to contend that his waste collection activities caused little or no harm, asserting that a "debris field" the State identified on his property "was in fact [c]omposted material" that was beneficial to the environment. But Pillon's conclusory assertions in this regard are insufficient to satisfy his burden on collateral review. See In re Pers. Restraint of Rice, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992) ("Bald assertions and conclusory allegations will not support the holding of a hearing. Rather, with regard to the required factual statement, the petitioner must state with particularity facts which, if proven, would entitle him to relief. . . . If the petitioner's allegations are based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." (citation omitted)). Pillon claims that Jeff Fowlow, USEPA's "On Scene Coordinator," stated that USEPA found no

hazardous materials in the "debris field." But Pillon offers only inadmissible hearsay in support of this claim.[8]

Furthermore, the record belies Pillon's assertion that USEPA's investigation "quickly dismantled the State contention that there was a massive quantity of hazardous material buried on my land . . . not in the debris field nor any other portion." (Emphasis omitted.) Pillon stipulated that USEPA's sampling at his property revealed lead, arsenic, cadmium, and chromium in samples taken from the Bus/RV area, the Workshop Area, and the Landfill Area. And, Fowlow confirms in a declaration submitted with the State's response that sampling at Pillon's property revealed the presence of environmental contaminants:

> EPA has collected dozens of surface and subsurface soil samples from across the site and analyzed them for common environmental contaminants. The result of the analyses on these soil samples collected in 2016, 2018, and 2019 across the Site indicated that the following compounds exceeded EPA risk-based screen levels and/or state cleanup levels: diesel, motor oil, gasoline, cadmium, arsenic*,[9] lead, thallium*, dioxins, PCBs, 1,2-Dibromo-3-Chloropropane, Benzo[a]anthracene, Benzo[a]pyrene, Benzo[b]fluoranthene, Dibenz[a,h]anthracene, m-Xylene & p-Xylene.
>
> . . . As part of the 2018 removal activities, EPA collected 12 surface water samples from across the Site and analyzed them for common environmental contaminants. The results indicated exceedances of the following compounds at state and/or federal screening levels: arsenic*, lead, selenium, thallium*, diesel and motor oil. As part of the 2019

---

[8] Specifically, Pillon claims that Fowlow told Pillon and Pillon's friend, Jarrod Wood, that there was no hazardous material in the "debris field." Pillon also submits a declaration from Wood in which Wood states, "I was there the day the EPA dug into the big berm behind the house. It quickly became clear when the EPA dug clear down 25 feet in places that there was nothing but compost there – and Jeff Fowlow from the EPA said so in my presence." (Some capitalization omitted.)

[9] According to Fowlow's declaration, an asterisk "indicates compounds likely to exist at similar concentrations naturally."

removal activities, EPA collected seven groundwater samples from installed monitoring wells and analyzed them for common contaminants. The results indicated exceedances of the following compounds at state and/or federal screening levels: diesel, motor oil, arsenic*, cobalt, iron, manganese, 2,6-dinitrotoluene, bis(2-ethylhexyl) phthalate, hexachlorobenzene, hexachlorobutadiene, hexachloroethane[.]

* * *

. . . Of the six monitoring wells installed on the May Creek Landfill property, groundwater from five of them contained at least one of several Semi Volatile Organic Compounds above screening levels, and three wells contained hydrocarbon compounds above screening levels. Additionally, various metals were detected above screening levels in all site monitoring wells but one.

Pillon offers a number of conclusory allegations to the contrary, asserting, for example, that USEPA confirmed that the compost area contained "only soil" and thus was a "finally-proven-innocent-compost-pile," that USEPA's investigations "confirmed that the few spots were only surface stains . . . not pollution-in-depth," and that Pillon conducted his own testing "a few years back and the soil was proven safe." (Emphasis omitted.) Pillon provides no admissible evidence in support of his assertions and, as discussed, conclusory assertions are insufficient to warrant collateral relief.

Pillon also contends that the litter payment violates the Eighth Amendment because it was speculative and not based on actual cleanup costs. But the litter payment was not speculative. It was set by applying a $100 per cubic foot multiplier to the amount of litter, as expressly authorized by RCW 70A.205.195(3)(c)(ii).[10] To this

---

[10] Pillon raises only Brady-related and excessive fines challenges to the litter payment imposed under this statute. He does not argue that as a matter of statutory interpretation, the statute requires the State to actually remove litter before a litter payment can be imposed. Thus, we need not address this argument. We note, however, that the statute itself provides that the court may order the defendant to

end, as the State points out, "if the value of the fine is within the range prescribed by a legislative body, a strong presumption exists that [it] is constitutional." Long, 198 Wn.2d at 175 (citing United States v. Seher, 562 F.3d 1344, 1371 (11th Cir. 2009)); see also Bajakajian, 524 U.S. at 336 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature.").

Pillon does not allege facts to overcome this presumption. He appears to assert that the litter payment is unconstitutional inasmuch as no cleanup is actually necessary, but this assertion relies on his contentions that the materials on his property are innocuous. These contentions are, as discussed above, too conclusory to warrant relief. Pillon also asserts that the State has undertaken no cleanup activities on his property, apparently arguing that this, too, constitutes evidence that no cleanup is needed. To the extent the State has decided not to conduct any cleanup at Pillon's property, such a decision might be relevant to the "extent of the harm caused" inquiry. But as discussed, this inquiry is just one aspect of the excessive fines test, which Pillon does not meaningfully address. In any case, Pillon does not present any evidence that no cleanup or remediation activities will ever occur.[11] He also provides no evidence to counter the State's affiants' attestations that groundwater monitoring at Pillon's property

---

remove and properly dispose of the litter in addition to ordering the defendant to pay a litter payment. RCW 70A.205.195(3)(c)(v).

[11] Pillon appears to assert in his reply that the State's removal of certain vehicles and other collectible memorabilia from his property will constitute an infringement on his constitutional right to life, liberty, and property. But an argument raised for the first time in a reply brief comes too late to warrant consideration. See In re Pers. Restraint of Krier, 108 Wn. App. 31, 37 n.4, 29 P.3d 720 (2001) (summarily denying additional claim for relief raised for the first time in reply).

is ongoing or that offsite assessment is necessary to determine the full nature and extent of contamination that may have migrated from his property. Pillon does not establish that the asserted lack of State cleanup efforts to date entitle him to relief.[12]

Pillon next asks this court to consider a number of declarations that "reflect not only [his] community efforts in public safety issues as noted by [his] neighbors . . . but also efforts in environmental concerns where agencies have been slow to act and both public safety and environment were affected." Pillon also asks this court to consider an exhibit consisting "primarily of a Photo Record of [his] Community Public Safety and Clean-up efforts." Pillon asserts that these materials demonstrate that he has "always sought collaboration and mutual respect" and that his intentions, character, and motives should be considered in an excessive fines analysis. However, Pillon does not offer any authority in support of the proposition that his intentions, character, and motive— however good—are relevant to an excessive fines analysis.

As a final matter, "courts considering whether a fine is constitutionally excessive should also consider a person's ability to pay." Long, 198 Wn.2d at 173. But to the

---

[12] In his Supplement, Pillon invokes double jeopardy and asserts that because the State designated USEPA to clean up his property and because USEPA has invoiced Pillon (approximately $1,500,000) for a cleanup, the State is barred from collecting anything from him. This argument comes too late to warrant consideration. In any event, Pillon provides no evidence to support his assertion that the State delegated the cleanup to USEPA. Further, the record reflects that although USEPA has incurred approximately $1.5 million to evaluate Pillon's property and conduct a "Time-Critical Removal Action," the primary purpose of that action was "to characterize, inventory, and document the disposal of numerous containers that had been stored on the site and that potentially contained hazardous substances" and to "evaluate potential impacts to the environmental condition of the site"; and significant amounts of solid waste, vehicles, and debris remained on Pillon's property even after USEPA completed its activities at the site.

extent Pillon contends he is unable to pay the litter payment, he does not point to any specific facts to establish his inability to pay. Also, Pillon does not dispute the State's representation, which is supported by a declaration from the legal financial obligation collector assigned to Pillon's case, that Pillon's $1,000 monthly payment obligation was set based on Pillon's representations as to what he was able to pay. And as the State points out, the judgment and sentence provides that if Pillon is not able to afford the monthly payments, he can ask the court to reduce them to a minimum of $300 per month. See RAP 16.4(d) ("The appellate court will only grant relief by a personal restraint petition if other remedies which may be available to petitioner are inadequate under the circumstances.").

Pillon does not establish that the litter payment constitutes an unlawful restraint. See RAP 16.4 (collateral relief warranted only where petitioner is under a restraint and the restraint is unlawful). Therefore, we deny his petition.

_Appelwick, J._

_____

_____