FILED
COURT OF APPEALS
DIVISION II

2015 JUL 28 AM 8: 24

STATE OF WASHINGTON
BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of<br>the Personal Restraint Petition of<br><br><br>GEORGE P. WOODARD,<br><br><br><br>Petitioner. | No. 45709-1-II<br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, J. — In this personal restraint petition (PRP), George P. Woodard challenges his conviction for first degree kidnapping with sexual motivation[1] and second degree child rape,[2] for kidnapping and raping M.P.[3] Woodard argues that (1) appellate counsel provided ineffective assistance by failing to assign error to the trial court's denial of two mistrial motions for jailhouse informant testimony to Woodard's prior bad acts. Woodard also argues that trial counsel provided ineffective assistance by failing to (2) properly impeach witnesses, (3) object to Lisa Wahl-Hermosillo's testimony defining rape as blunt penetrating trauma, (4) object to Wahl-Hermosillo's testimony stating that sex as M.P. had described would constitute "victimization," (5) object to Wahl-Hermosillo's testimony referencing a medical study not in evidence about 37 pregnant teenage girls, (6) object to the State's mischaracterization of Wahl-Hermosillo's testimony referencing the study of the pregnant girls, (7) call a medical expert for the defense, or

---

[1] Former RCW 9A.40.020(1)(b) (1975); former RCW 9.94A.835 (2006).

[2] RCW 9A.44.076.

[3] We use initials to protect the victim's privacy.

No. 45709-1-II

(8) object to admission of M.P.'s rape kit and underwear for a lack of chain of custody. In addition, Woodard argues that he was denied a right to a fair trial by (9) the trial court's admission of the rape kit and underwear without a sufficient chain of custody, (10) the trial court's comment on the evidence, (11) the trial judge's bias against Woodard, and (12) cumulative error. We reject Woodard's arguments and deny his petition.

FACTS

In 2008, M.P. spent Christmas Eve with friends and family members at Woodard's home. M.P. was 12 years old at the time. M.P. wanted to go to the store and Woodard agreed to drive her there in his van. Three witnesses testified the store was only a few minutes away by vehicle, but Woodard and M.P. were gone for between 20 and 45 minutes.

According to M.P., while returning from the store, Woodard took a different route home, drove down a back road, and stopped the van. Woodard ordered M.P. to get into the backseat and pull down her pants. He then put his mouth on her breast over the outside of the hoody that she was wearing and inserted his finger into her vagina. He stopped after about 10 to 20 minutes and drove home.

The next day, M.P.'s mother learned what had happened and called the police. The State charged Woodard with first degree kidnapping with sexual motivation, second degree child rape, and second degree child molestation.[4] Woodard's case proceeded to a jury trial.

A.    *Trial Court's Pretrial Instruction to the Jury*

Prior to trial, the trial court made the following instruction to the jury:

---

[4] RCW 9A.44.086.

2

No. 45709-1-II

> There may be some evidence that certain things happened at a particular location. You may know where that location is. You may go near it or by it going to or from the Law and Justice Center or perhaps over the weekend or during a long recess. If that's the situation don't stop to look things over, because conditions may not necessarily be the same as they were when *all the actions took place that led to the charges being filed.*
>
> Keep an open mind. Don't decide any issue in this case, until the entire case has been submitted to you.

1 Verbatim Report of Proceedings (VRP) at 107 (emphasis added). Woodard's trial counsel moved for a mistrial, arguing that the trial court's statement that "all the actions took place that led to the charges being filed" commented on the evidence. 1 VRP at 107. The trial court denied the mistrial motion.

B.     *Trial Testimony of James Barnes and Jonathan Neff*

At trial, the State presented testimony from two jailhouse informants: James Barnes and Jonathan Neff, both called by the State to testify that Woodard had confessed to the sex offenses at issue in Woodard's case. Woodard challenges one statement from each witness.

1. *Barnes's Testimony Woodard Confessed to Sexual Intercourse with M.P. on Six Prior Occasions*

During a pretrial hearing on motions in limine, trial counsel expressed concern Barnes or Neff might testify that Woodard confessed to sexual intercourse with M.P. on six occasions *prior* to the sex offenses at issue in Woodard's case. The State said it did not intend to elicit testimony about uncharged prior sexual incidents on direct examination, but that it could contemplate possible scenarios where the issue could arise on cross-examination. The trial court ordered the State to instruct the witnesses not to mention Woodard's alleged admissions of sexual intercourse with M.P. prior to the incident at issue in the case. At trial, during the State's examination of Barnes, the following testimony occurred:

3

> [State]: Did [Woodard] say he did anything else to [M.P.] on that night?
> [Barnes]: The comment was that [Woodard] didn't have a rubber, so he had oral sex with her.
> [State]: In other words, he was denying that he had penile sexual intercourse with her?
> [Barnes]: That night, yes.
>
> . . . .
>
> [State]: You said that Mr. Woodard indicated to you that he had stuck his finger in [M.P.]?
> [Barnes]: Yes.

4 VRP at 64-66. Then, during trial counsel's cross-examination of Barnes, the following testimony occurred:

> [Trial Counsel]: Is it your testimony that [Woodard] told you directly all of the things that you just testified to?
> [Barnes]: Yes, sir.
>
> . . . .
>
> [Trial Counsel]: [Woodard] told you he didn't have sexual intercourse with [M.P.]?
> [Barnes]: On Christmas day. On Christmas eve he did not. *He had six times of intercourse before that he bragged about.*

4 VRP at 68 (emphasis added). Outside of the jury's presence, trial counsel immediately moved for a mistrial. The State asserted that it had told Barnes to refrain from mentioning the six prior instances of intercourse and argued that trial counsel's question may have unintentionally elicited the response. Trial counsel asked if his question to Barnes could be read back. The trial court initially responded by telling trial counsel, "You can be quiet," but eventually had the question read back. 4 VRP at 70-71.

The trial court denied the mistrial motion. The trial court then recalled the jury and instructed them to disregard the question and answer.

2. *Neff's Testimony Woodard Smoked Crack Cocaine Immediately Prior to the Rape*

The parties agreed not to elicit testimony regarding any of the witnesses' drug use. Later, during the State's direct examination of Neff, the following testimony occurred:

[State]: Did [Woodard] ever indicate anything that he had done on Christmas eve of 2008?

[Neff]: Well, he indicated he was at his house with some friends and his wife and *they were smoking crack* and he was asked—I can't say if he asked or if [M.P.] had asked to go to the store to get some candy.

. . . .

[State]: Okay. What else did [Woodard] say?

[Neff]: . . . . [Woodard] explained that he had pulled over there with [M.P.] and that he had digitally penetrated her and orally—had oral sex with her.

4 VRP at 78-79 (emphasis added). Trial counsel did not object to this testimony, but at the conclusion of Neff's testimony, counsel moved for a mistrial, arguing that Barnes's testimony about Woodard's confession to prior intercourse with M.P., combined with Neff's testimony about Woodard's confession to using crack cocaine, denied Woodard a fair trial. The trial court denied the motion. The trial court ruled that, within the context of Neff's testimony as a whole, the violation was not egregious enough to warrant a mistrial. The trial court also ruled that Barnes's and Neff's testimony combined did not rise to the level of warranting a mistrial. The trial court offered to instruct the jury to disregard the question and answer regarding Woodard's drug use, but trial counsel declined the offer because he did not want to draw the jury's attention to it.

C.    *Inability To Impeach Witnesses*

Trial counsel endeavored to impeach witnesses on four separate occasions.

1. *Impeachment of Dallas Hazelrigg Concerning the Purpose of His Trip*

At trial, Dallas Hazelrigg was one of three witnesses who testified that Woodard and M.P. were gone to the store for between 20 and 45 minutes. To establish the length of time Woodard and M.P. were away from Woodard's home, Hazelrigg testified about his activities during the time Woodard left to take M.P. to the store. Hazelrigg said that he and his brother left

Woodard's home just after Woodard left with M.P., and followed Woodard until Woodard stopped at the store. Hazelrigg and his brother then stopped following Woodard and went down a gravel road to a place "[a]lmost across the street from the store." 2 VRP (Part 1) at 83. Hazelrigg testified that his brother went down the gravel road with intent to purchase drugs from a drug dealer, and that Hazelrigg also went down the road to purchase a chain saw from the same drug dealer.

On cross-examination, trial counsel attempted to impeach Hazelrigg's testimony with his unrecorded out-of-court statement to trial counsel, in which Hazelrigg specifically denied the purpose for the errand:

> [Trial Counsel]: . . . You and I have talked a couple of times about this case; is that right?
> [Hazelrigg]: That's right.
> [Trial Counsel]: You have specifically told me that when you and [your brother] went on your errand, it was not to buy drugs; is that right?

2 VRP (Part 1) at 94. The trial court sustained a hearsay objection by the State, ruling trial counsel could not impeach Hazelrigg with an oral statement given to trial counsel because trial counsel could not testify in Woodard's trial, meaning Hazelrigg's statement to trial counsel could not be corroborated. Trial counsel subsequently elicited the following testimony:

> [Trial Counsel]: What you told me [out of court] yesterday, does that differ from what we heard in Court today?
>
> . . . .
>
> [Hazelrigg]: It's not different. It's just more.
> [Trial Counsel]: Really? What's the more?
> [Hazelrigg]: Yesterday, you were looking for a drug run and I wouldn't basically tell you what I was doing, because I felt it was irrelevant to the case or further putting me admitting on the stand that I was going to run for drugs, which I really wasn't if you want to go into the long haul of it.
>
> . . . .
>
> [Trial Counsel]: So what you are saying is I asked you yesterday about a drug run—

6

[Hazelrigg]: Correct.

. . . .

[Trial Counsel]: Did you tell me "yes" or "no"?
[Hazelrigg]: I didn't answer it. I said I went for a chainsaw [sic] is what I answered.

. . . .

[Trial Counsel]: Did they sell [your brother] drugs?

. . . .

[Hazelrigg]: No, they did not.

2 VRP (Part 1) at 100-03. Trial counsel also elicited testimony that Hazelrigg did not mention drugs when giving a statement to Deputy Susan Shannon.

### 2. *Impeachment of Deputy Shannon Concerning Mirandizing Woodard*

The State called Deputy Shannon, who gave Woodard his *Miranda*[5] warnings. Deputy Shannon testified that when she asked Woodard whether he wanted to speak with her, Woodard said, "Yes." 3 VRP at 133. Trial counsel attempted to impeach this testimony with Deputy Shannon's written report in which Woodard said, "Yeah, I don't have a problem" instead of "yes" by personally reading from the report. 3 VRP at 148. The trial court raised its own objection, ruling trial counsel's impeachment method was improper under ER 613. Outside of the jury's presence, trial counsel explained to Deputy Shannon that he wanted Deputy Shannon to testify to Woodard's statement, "Yeah, I don't have a problem" in Deputy Shannon's written report. 3 VRP at 148. With the jury present, Deputy Shannon testified that in Deputy Shannon's written report Woodard responded to Deputy Shannon's request to speak with him with, "Yeah, I don't have a problem." 3 VRP at 148.

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

3. *Impeachment of Deputy Shannon Concerning M.P.'s Statement She Wore a Hoody*

Deputy Shannon also took recorded statements from M.P. Deputy Shannon testified that she collected a "hoody" from M.P. The State called M.P., who testified that she wore this hoody when Woodard raped her and put his mouth on her breast over the hoody. DNA testing confirmed that Woodard's DNA was on the hoody, in the same location as where M.P. testified Woodard had put his mouth on her breast over the hoody. Woodard's DNA came from "[a]mylase activity" which was "usually associated with saliva," although "other body fluid sources [could not] be eliminated." Petition (App. H at 3).

When Woodard was presenting his case, trial counsel recalled Deputy Shannon and elicited the following testimony:

> [Trial Counsel]: Do you remember if on either one of [M.P.'s] taped statements she told you what she was wearing when she was driven to the store by Mr. Woodard?
> . . . .
> [Trial Counsel]: You don't recall?
> [Deputy Shannon]: I was trying to recall your question. Did she ever tell me?
> [Trial Counsel]: [W]hat she was wearing as far as a shirt when she went to the store with [Woodard].
> [Deputy Shannon]: Yes.
> [Trial Counsel]: Do you recall what that was?
> . . . .
> [Deputy Shannon]: It was a gray "I love me" shirt, blue hoody and the Vigoss jeans.

5 VRP at 44-45. Trial counsel attempted to impeach Deputy Shannon's testimony (that M.P. told Deputy Shannon that M.P. was wearing a hoody when she was raped) with M.P.'s alleged omission of any reference to a hoody in her *taped* statement to Deputy Shannon. The State objected and the trial court sustained, ruling that Deputy Shannon testified M.P. stated that she

was wearing a hoody during the rape, but did not testify that M.P.'s statement about the hoody was recorded *in M.P.'s taped statement*. Then, the following occurred:

> [Trial Counsel]: Deputy Shannon, the question I asked moments ago, did you understand it to be that I was asking you about what [M.P.] told you in her two taped statements?
>
> . . . .
>
> [Deputy Shannon]: No.

5 VRP at 51. Trial counsel then attempted to elicit testimony from Deputy Shannon that M.P.'s statement about the hoody was recorded in M.P.'s taped statement, but was prevented from eliciting such testimony by the State's successful hearsay objections.

### 4. *Impeachment of Barnes with His Declaration to the State*

Prior to Woodard's trial, Barnes sent a declaration under penalty of perjury to the State requesting withdrawal of a State subpoena compelling Barnes to testify at Woodard's trial. Barnes's declaration stated he had no actual or constructive knowledge regarding Woodard's case and could provide no testimony for either the State or the defense. Barnes testified at Woodard's trial for the State, but trial counsel did not impeach Barnes with his declaration.

### D. *Expert Testimony*

The State called two medical experts at Woodard's trial. First, the State called Dr. Paul Sunderland, who gave M.P. a medical examination on December 25, 2008. Dr. Sunderland testified that M.P. said she had been raped. Dr. Sunderland testified that the entrance of M.P.'s vagina was tender and swollen and that M.P.'s hymen was not intact. Dr. Sunderland testified that hymen breakage typically resulted from penetration and that broken hymens do not grow back. Dr. Sunderland testified that while there was some evidence of vaginal trauma, none of M.P.'s injuries were serious, and all her injuries would have healed within a week at the longest.

Second, the State called nurse practitioner Lisa Wahl-Hermosillo, who had given M.P. a medical examination on December 30, 2008. Wahl-Hermosillo testified M.P. told her that she had been sexually assaulted, and that this sexual assault included penile/vaginal penetration. Contrary to Dr. Sunderland's testimony, Wahl-Hermosillo testified that M.P's hymen was intact. Wahl-Hermosillo also testified that the physical exam had no indications that M.P. had been raped. While Wahl-Hermosillo testified that M.P. had no vaginal injuries, Wahl-Hermosillo testified that she would not expect to see any vaginal injuries on M.P. when she conducted her examination, which was five to six days after the rape.

Wahl-Hermosillo made three statements in her testimony that Woodard challenges in his PRP. First, Wahl-Hermosillo stated the following on direct examination:

> [State]: Now, what did you note on your physical exam when you looked at [M.P.'s] hymen?
> [Wahl-Hermosillo]: I found that she had a shallow notch on her hymen . . . . A notch is considered a normal variant and it could or could not indicate blunt penetrating trauma, *which as the legal term is called rape.*

5 VRP at 13-14 (emphasis added). Second, the following testimony occurred on redirect:

> [State]: So in your opinion, it would be possible for [M.P.] to have sex as she described and not see any physical signs, correct?
> [Wahl-Hermosillo]: Well, I wouldn't call it sex. *I would call it victimization,* but, yes, that's true.

5 VRP at 24 (emphasis added). Third, the following testimony occurred on redirect:

> [State]: Is it possible to have actual penile penetration without any injuries?
> [Wahl-Hermosillo]: Yes. In fact, they have done a study, where they had 37 pregnant teenage girls and all but three had normal findings and it's fairly obvious that something had happened.

5 VRP at 23. Trial counsel did not object to the above statements by Wahl-Hermosillo.

Woodard did not call a medical expert.

E.      *Physical Evidence—Chain of Custody*

At trial, the State admitted M.P.'s rape kit and a bag containing M.P.'s underwear. Lisa Engler, a registered nurse at a hospital, testified she watched M.P. remove the underwear and place it in the bag, and that Engler sealed the bag with an evidence seal and placed her initials and the time on the bag. Engler testified she conducted a series of tests on M.P., and then placed the testing materials and the underwear in a rape kit, which she sealed with her initials and a time stamp. Engler testified she then submitted the rape kit to the sheriff's office.

Sheriff's Deputy Chris Fulton testified that he went to the hospital and received the rape kit in sealed condition, transported it to the sheriff's office, and placed it in the sheriff's evidence refrigerator. Deputy Fulton testified he sealed the refrigerator with evidence tape and initialed the tape.

Sheriff's Deputy Debra Hensley testified she removed the seal from the refrigerator and removed the rape kit from the refrigerator. Deputy Hensley testified the rape kit was then submitted to the Washington State Patrol Crime Lab (WSPCL).

Teresa Shank, a WSPCL forensic scientist, testified she received the rape kit in sealed condition. Shank testified she opened the rape kit, removed the bag from the rape kit, and removed the underwear from the bag. Shank testified she then conducted tests on the items, resealed the underwear in the bag, resealed the underwear and other items in the rape kit, and returned the rape kit to the sheriff.

After the sheriff received the rape kit, the sheriff submitted the rape kit to Orchid Cellmark Incorporated, a private DNA testing corporation. Orchid tested the items in the rape kit and returned the rape kit to the sheriff.

In preparation for trial, the rape kit was unsealed and opened in Engler's presence and the bag was removed from it. At trial, Engler identified the rape kit and testified it was in the same condition as when she gave it to the sheriff except that it had additional seals. Engler identified the bag by the evidence seal, the time, and her initials on the bag. Engler testified that the bag was in the same condition as when she gave it to the sheriff. Shank identified the rape kit and bag at trial and testified they were in the same condition at trial as when she received them at the WSPCL, except that they were already opened at trial.

Deputy Hensley identified the rape kit at trial. Deputy Hensley testified that it looked the same as when she acquired it from the refrigerator prior to it being sent to the WSPCL, except that it had additional seals. Deputy Fulton could not identify the rape kit at trial.

On direct examination, M.P. identified the underwear as the underwear she wore when she was raped. But then, on cross-examination, M.P. testified she could not identify the underwear.

The State attempted to admit the rape kit multiple times during trial. Trial counsel consistently challenged admission by objecting to "foundation." *See* 3 VRP at 154; 4 VRP at 116. While trial counsel did not specifically say he was objecting to chain of custody, it was clear that trial counsel's foundation objections went to chain of custody. After one of trial counsel's foundation objections, a colloquy about chain of custody occurred. After another foundation objection, a voir dire of a witness about chain of custody occurred. The trial court sustained trial counsel's foundation objections multiple times. After the State presented an additional witness to establish chain of custody, the trial court admitted the underwear and rape kit over trial counsel's objection.

F.    *Closing Argument*

Whereas Wahl-Hermosillo testified that the study of 37 pregnant teenaged girls concluded it is possible for a woman to have had sexual intercourse and still have an intact hymen, the State stated in closing argument:

> Ms. Wahl even told you about statistics that showed women that were pregnant and *it's hard to tell whether the hymen was in fact intact or not.*

5 VRP at 98 (emphasis added).  Trial counsel did not object to this statement.

Both parties made many objections to the other party's closing argument for arguing facts not in evidence or misrepresenting testimony.  The trial court sustained six of the State's objections for arguing facts not in evidence or misrepresenting testimony.  In contrast, the trial court overruled all of trial counsel's five objections for arguing facts not in evidence or misrepresenting testimony.  After closing arguments, trial counsel moved to dismiss the charges because the trial court ruled in favor of the State and against trial counsel on the objections.  The trial court denied trial counsel's motion to dismiss, ruling there was no evidence in the record to substantiate trial counsel's arguments objected to by the State.

G.    *Conviction, Evidentiary Sentencing Hearing on Prior Conviction's Existence, and Trial Court's Statement*

A jury found Woodard guilty on all three counts.  After Woodard's conviction, the trial court held an evidentiary sentencing hearing on the existence of Woodard's prior child molestation conviction.  When the trial court ordered Woodard to provide his fingerprints in court to be used as evidence in the hearing, Woodard refused to comply.  Woodard asked the trial court, "Who is trying the case, you or the prosecutor?"  5 VRP at 160.  The trial court responded, "*I'm trying the case* and you're right on the edge of contempt.  If I find you in

contempt, it's dead time." 5 VRP at 160-61 (emphasis added). Woodard then provided his prints.

The trial court found that the prior child molestation conviction existed. Based on the prior child molestation conviction and Woodard's current conviction for first degree kidnapping and second degree child rape, the trial court found that Woodard was a persistent offender and sentenced him to life imprisonment without the possibility of parole.

H.    *Direct Appeal*

Woodard appealed his convictions. On direct appeal, appellate counsel argued that admitting testimony of Woodard's confession to the six prior instances of intercourse with M.P. and crack cocaine use violated the evidence rules and denied Woodard a fair trial. While appellate counsel noted that trial counsel made mistrial motions that were denied, appellate counsel neither explicitly assigned error to the trial court's denial of the mistrial motions nor argued that the trial court erred by denying the mistrial motions. Because appellate counsel did not assign error to or challenge the trial court's denial of the mistrial motions, we did not consider Woodard's arguments regarding Barnes's and Neff's testimony to Woodard's confessions to prior bad acts.

We reversed Woodard's current conviction for second degree child molestation on double jeopardy grounds, but upheld the kidnapping and second degree child rape convictions and his life sentence as a persistent offender. Woodard then filed this PRP.

## ANALYSIS

The petitioner's ability to collaterally attack his restraint through a PRP is limited by law. *In re Pers. Restraint of Crow*, ___ Wn. App. ___, 349 P.3d 902, 905-06 (2015). The petitioner

14

must allege particularized facts which, if proven, would entitle the petitioner to relief. 349 P.3d at 905. The petitioner also must support those factual allegations with evidence. 349 P.3d at 905. Where the record does not support the petitioner's allegations, he must produce affidavits or other forms of corroboration showing that competent and admissible evidence will establish his allegations. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). If the parties' materials raise issues of material fact, we order a reference hearing for the superior court to resolve them. 118 Wn.2d at 886-87. But we will not remand for a reference hearing unless the petitioner has made his threshold showing. *See* 118 Wn.2d at 886-87.

Before the petitioner is entitled to collateral relief through a PRP, he must prove the alleged error's existence. *Crow*, 349 P.3d at 906. Furthermore, to be entitled to relief for a constitutional error, he must prove that the error caused actual and substantial prejudice. 349 P.3d at 906. To be entitled to collateral relief for a nonconstitutional error, he must prove that the error caused a fundamental defect resulting in a complete miscarriage of justice. 349 P.3d at 906.

I. INEFFECTIVE ASSISTANCE OF COUNSEL

On an ineffective assistance of trial counsel claim, the defendant bears the burden of showing deficient performance and resulting prejudice. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of counsel's performance is highly deferential; it strongly presumes reasonableness. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

To show deficient performance, the defendant must show the absence of any conceivable legitimate tactic supporting trial counsel's action. *Grier*, 171 Wn.2d at 32-33. To establish prejudice, the defendant must show a reasonable probability that but for the deficient performance, the result of the proceeding would have been different. *Thomas*, 109 Wn.2d at 226. Because ineffective assistance of counsel claims present mixed questions of law and fact, we review them de novo. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001).

In order to establish an ineffective assistance of appellate counsel claim, the defendant must show the legal issue appellate counsel failed to raise had merit and that he was actually prejudiced by the failure to raise or adequately raise the issue. *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 787-88, 100 P.3d 279 (2004). To show prejudice, the petitioner must show a reasonable probability that but for counsel's failure to raise the meritorious issue on appeal, the petitioner would have prevailed. 152 Wn.2d at 788.

A.    *Appellate Counsel's Failure To Assign Error to the Denial of Mistrial Motions*

Woodard argues that appellate counsel provided ineffective assistance by failing to assign error to the trial court's denial of mistrial motions for Barnes's and Neff's testimonies of Woodard's confessions to prior bad acts. Because Woodard cannot show prejudice, we disagree.

To establish prejudice, Woodard must show a reasonable probability that but for counsel's failure to raise the issue on appeal, Woodard would have prevailed. *Dalluge*, 152 Wn.2d at 788. To determine whether Woodard would have prevailed, we review the trial court's decision to deny the motions for mistrial.

On direct appeal, we review the decision to grant or deny a mistrial motion under the abuse of discretion standard because the trial court is in the best position to assess whether a remark can be cured by admonition or requires a mistrial. *State v. Dickerson*, 69 Wn. App. 744, 748, 850 P.2d 1366 (1993); *State v. Escalona*, 49 Wn. App. 251, 254-55, 742 P.2d 190 (1987). A mistrial is appropriate only when the defendant was so prejudiced that only a new trial can ensure a fair trial. *State v. Whitney*, 78 Wn. App. 506, 515, 897 P.2d 374 (1995).

To determine whether erroneous testimony was prejudicial enough to warrant a mistrial, we consider three factors. First, we consider the erroneous testimony's seriousness, i.e., whether the erroneous testimony was serious enough to materially affect the trial's outcome. *State v. Greiff*, 141 Wn.2d 910, 921, 10 P.3d 390 (2000); *State v. Hopson*, 113 Wn.2d 273, 284, 286, 778 P.2d 1014 (1989). Second, we consider whether the erroneous testimony involved cumulative evidence. *Greiff*, 141 Wn.2d at 921. Third, we consider whether the trial court provided a proper instruction to disregard the erroneous testimony; an instruction the jury is presumed to follow. 141 Wn.2d at 921; *Hopson*, 113 Wn.2d at 287. Finally, we determine whether the erroneous testimony denied the defendant a fair trial by analyzing the strength of the State's case against Woodard, considered "against the backdrop of all the evidence." *Escalona*, 49 Wn. App. at 254.

Under ER 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Here, Barnes testified that Woodard claimed to have intercourse with M.P. on six occasions prior to the alleged rape at issue in Woodard's case, and Neff testified that Woodard used an illicit drug prior to the alleged rape at issue in Woodard's case.

In analyzing whether a mistrial should have been granted for these statements, we first characterize Barnes's and Neff's statements as serious, but not serious enough to materially affect the trial's outcome. The offending testimony here consisted of Barnes's brief statement that Woodard had told Barnes about Woodard's prior intercourse with M.P. and Neff's brief statement that Woodard told Neff about Woodard's drug use. Neither Barnes nor Neff testified that Woodard actually committed these acts. Rather they claimed only that Woodard claimed to have committed these acts. Barnes's and Neff's brief statements were not serious enough to materially affect the trial's outcome.

The second factor is whether the statements were cumulative. *Greiff*, 141 Wn.2d at 921. There was no other evidence offered at trial regarding Woodard's prior sex offenses or drug use. In fact, the trial court had excluded the evidence of prior sex offenses and the parties had agreed not to elicit testimony about Woodard's drug use. Thus, the evidence was not cumulative.

The third factor is whether the trial court properly instructed the jury to disregard the erroneous testimony. 141 Wn.2d at 921. Here, the trial court gave an instruction to disregard Barnes's testimony about Woodard's claimed prior intercourse with M.P., an instruction jurors are presumed to follow. *Hopson*, 113 Wn.2d at 287. The trial court offered to give a curative instruction for Neff's statement about Woodard's claimed drug use, but trial counsel declined that instruction for strategic reasons.

Finally, we must determine whether the erroneous testimony denied the defendant his right to a fair trial by analyzing the strength of the State's case against Woodard, considered "against the backdrop of all the evidence." *Escalona*, 49 Wn. App. at 254. The State's case against Woodard was very strong and included the victim's testimony and DNA evidence. M.P.'s testimony was unequivocal. DNA testing confirmed that Woodard's DNA was on the hoody in the same location as where M.P. testified Woodard had put his mouth on her breast over the hoody. The evidence supported that this DNA came from "amylase activity" which is usually associated with saliva. M.P. testified that after Woodard took M.P. to the store, Woodard took a different route home, drove down a back road, stopped the van, and raped her for about ten to twenty minutes. Three witnesses testified the store was only a few minutes away by vehicle, but that Woodard was gone for between 25 and 30 minutes.

Dr. Sunderland testified that the entrance of M.P.'s vagina was tender and swollen. Wahl-Hermosillo testified that M.P. had no vaginal injuries but that she would not expect to see any vaginal injuries on M.P. when she conducted her examination five to six days after the rape.

Digital penetration and oral sex both establish the "sexual intercourse" element of child rape. RCW 9A.44.010(1)(c); *State v. Tili*, 139 Wn.2d 107, 115-17, 985 P.2d 365 (1999). M.P. testified that Woodard had oral sex with her and digitally penetrated her. This was confirmed by Barnes and Neff, both of whom testified that Woodard confessed to performing oral sex on and digitally penetrating M.P. on the date at issue in Woodard's case. Finally, two witnesses testified to M.P.'s distressed demeanor after the incident. Viewing Barnes's and Neff's brief and indirect remarks against the wealth of evidence against Woodard, we hold that Woodard was not denied his right to a fair trial.

We hold that the trial court did not abuse its discretion in refusing to grant a mistrial. Thus, Woodard has failed to show a reasonable probability that had appellate counsel assigned error to the trial court's denial of the mistrial motion on direct appeal, Woodard would have prevailed. Therefore, Woodard cannot prove prejudice and his ineffective assistance of appellate counsel claim fails.

B.      *Trial Counsel's Improper Impeachment of Witnesses*

Woodard argues that trial counsel provided ineffective assistance by failing to properly impeach witnesses in four instances. We disagree.

1. *Impeachment of Hazelrigg with His Unrecorded Statement to Trial Counsel*

Woodard argues that his trial counsel provided ineffective assistance by failing to properly use Hazelrigg's out-of-court statement to trial counsel to impeach Hazelrigg's testimony that his brother went to the street to purchase drugs. We disagree.

Although trial counsel initially failed to use Hazelrigg's out-of-court statement to trial counsel to impeach Hazelrigg's testimony that his brother went to the street to purchase drugs, trial counsel did elicit testimony that Hazelrigg mentioned drugs neither in his out-of-court statement to trial counsel nor in his statement to Deputy Shannon. Thus, because trial counsel successfully elicited the inconsistency between Hazelrigg's testimony about his brother's intent and what Hazelrigg told both trial counsel and Deputy Shannon, Woodard has failed to show that trial counsel's performance fell below an objective standard of reasonableness. Therefore, Woodard has failed to show deficiency.

2. *Impeachment of Deputy Shannon with Her Written Report*

Woodard argues that trial counsel provided ineffective assistance by struggling to use Deputy Shannon's written report to impeach Deputy Shannon's testimony that Woodard said "yes" in response to Deputy Shannon asking Woodard whether he wanted to speak with her. We disagree.

Deputy Shannon testified that when she asked Woodard whether he wanted to speak with her, Woodard said, "Yes." 3 VRP at 133. Trial counsel eventually succeeded in impeaching this testimony with Deputy Shannon's written report, in which Woodard responded to Deputy Shannon's question with, "Yeah, I don't have a problem," rather than "yes." 3 VRP at 148. Because trial counsel was able to elicit that Woodard said, "Yeah, I don't have a problem," in response to Deputy Shannon's question, Woodard has failed to show that trial counsel's performance fell below an objective standard of reasonableness. Therefore, Woodard has failed to show deficiency.

3. *Impeachment of Deputy Shannon or M.P. with M.P.'s Taped Statement*

Woodard argues that trial counsel provided ineffective assistance by failing to properly use M.P.'s taped statement to impeach M.P.'s and Deputy Shannon's testimony that M.P. was wearing a hoody. We disagree.

At trial, M.P. provided unequivocal testimony that she was wearing the hoody when Woodard raped her and that Woodard put his mouth on her breast over the hoody. Deputy Shannon testified that M.P. told Deputy Shannon, albeit not necessarily in the taped statement, that she was wearing the hoody when she was raped. DNA testing confirmed that Woodard's

DNA was on the hoody, in the same location as where M.P. testified Woodard had put his mouth on her breast over the hoody.

This testimony is not contradicted by the mere *absence of a reference* to the hoody in M.P.'s taped statement. The mere absence of a reference to a hoody provides minimal benefit to Woodard. Therefore, Woodard has failed to show that there is a reasonable probability that but for trial counsel's failure to impeach M.P. or Deputy Shannon with the absence of a reference to the hoody in M.P.'s taped statement, the outcome of the trial would have been different. Thus Woodard has failed to show prejudice.

4. *Impeachment of Barnes with his Declaration Requesting Withdrawal of a Subpoena*

Woodard argues that trial counsel provided ineffective assistance by failing to impeach Barnes with his declaration requesting the State to quash its subpoena, in which Barnes claimed he had no testimony to contribute to Woodard's case. We disagree.

Trial counsel did not impeach Barnes with his declaration that he had no testimony to contribute to Woodard's case. While Barnes's statement has some impeachment value because it shows Barnes's dishonesty, it does not directly contradict Barnes's claims against Woodard. Furthermore, the State would have been able to easily explain Barnes's statement to the jury by arguing that Barnes claimed he did not have any information to contribute to Woodard's trial because Barnes wanted the State to quash its subpoena merely because Barnes did not want to testify at Woodard's trial. On the other hand, as discussed above, the State's case against Woodard was very strong and included the victim's unequivocal testimony, DNA evidence, and strong circumstantial evidence. Thus, Woodard has failed to show a reasonable probability that

but for trial counsel's failure to impeach Barnes with his statement, the outcome of the trial would have been different. Therefore, Woodard has failed to show prejudice.[6]

C.     *Trial Counsel's Failure To Object to Wahl-Hermosillo's Testimony Defining Rape*

Woodard argues that trial counsel provided ineffective assistance by failing to object to Wahl-Hermosillo's testimony providing a legal conclusion by defining rape as blunt penetrating trauma. The State concedes Wahl-Hermosillo's testimony improperly provided a legal conclusion, but argues that trial counsel's failure to object to this testimony did not constitute ineffective assistance of counsel. Because Woodard has failed to prove prejudice, we agree with the State.

A witness may not testify to a conclusion of law. *Hyatt v. Sellen Constr. Co., Inc.*, 40 Wn. App. 893, 899, 700 P.2d 1164 (1985). "Improper legal conclusions include testimony that a particular law applies to the case, or testimony that the defendant's conduct violated a particular law." *State v. Olmedo*, 112 Wn. App. 525, 532, 49 P.3d 960 (2002).

Here, Wahl-Hermosillo's testimony defining rape as blunt penetrating trauma testified to an (inaccurate) legal conclusion. But this testimony did not suggest that M.P. was raped: it suggested that because Wahl-Hermosillo was unable to tell whether M.P. suffered blunt penetrating trauma, she was unable to tell whether M.P. had been raped. In fact, Wahl-Hermosillo testified that M.P.'s physical exam had no indications of rape. The jury was given instructions properly defining rape, which jurors are presumed to follow. *State v. Williams*, 159

---

[6] Woodard also argues that trial counsel's inability to impeach witnesses violated his right to confrontation, but does not explain how. Thus, we hold that Woodard has failed to prove the alleged error's existence.

Wn. App. 298, 321, 244 P.3d 1018 (2011). Thus, Woodard has failed to show a reasonable probability that but for trial counsel's failure to object to Wahl-Hermosillo's statement defining rape, the outcome of the trial would have been different. Therefore, Woodard has failed to prove prejudice.[7]

D.      *Trial Counsel's Failure To Object to Wahl-Hermosillo's "Victimization" Comment*

Woodard argues that trial counsel provided ineffective assistance by failing to object to Wahl-Hermosillo's testimony to her opinion that intercourse as M.P. had described would constitute victimization. We disagree.

Expert witnesses may testify in the form of an opinion. ER 702. But expert witnesses may not testify to an opinion as to a defendant's guilt. *Olmedo*, 112 Wn. App. at 530.

Here, Wahl-Hermosillo's statement was that intercourse as *M.P. had described* would be victimization, not that such a victimization actually occurred. In fact, Wahl-Hermosillo testified that the physical exam had no indications that M.P. had been raped. The parties below did not dispute that intercourse *as M.P. had described* would be victimization; they disputed only the truth of M.P.'s description. Thus, Woodard has failed to show a reasonable probability that but for trial counsel's failure to object to Wahl-Hermosillo's statement about victimization, the

---

[7] Woodard argues that Wahl-Hermosillo's testimony defining rape denied Woodard a fair trial by testifying to a legal conclusion. For the same reason he has failed to show prejudice under the ineffective assistance of counsel standard, Woodard has failed to show either actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice. Thus, Woodard's claim fails whether it asserts an evidentiary or constitutional error.

outcome of the trial would have been different. Therefore, Woodard has failed to show prejudice.[8]

E.     *Trial Counsel's Failure To Object to Wahl-Hermosillo's Testimony About the Study*

Woodard argues that trial counsel provided ineffective assistance by failing to object to Wahl-Hermosillo's testimony for referencing a study of 37 pregnant girls that was not admitted. We disagree.

Here, Wahl-Hermosillo gave a passing reference to the study of 37 pregnant girls without providing any detail. If trial counsel had objected to Wahl-Hermosillo's reference to the study, it would have called attention to the study. Also, the State could have responded by eliciting additional foundational information about the study to support her reference to the study, which could have damaged Woodard's case. Thus, it is a conceivable legitimate strategy to avoid objecting to Wahl-Hermosillo's passing reference to the study to avoid eliciting additional testimony expanding upon the study's legitimacy. Therefore, Woodard has failed to show that trial counsel was deficient for failing to object to Wahl-Hermosillo's testimony for referencing a study of 37 pregnant girls that was not admitted.[9]

---

[8] Woodard also argues that Wahl-Hermosillo's testimony that intercourse as M.P. had described would constitute victimization denied him his constitutional right to a fair trial. For the same reason Woodard has failed to show prejudice under the ineffective assistance of counsel standard, he has failed to show actual and substantial prejudice. Thus, his claim fails.

[9] Woodard also argues that Wahl-Hermosillo's testimony about the study of 37 pregnant girls denied him a fair trial by citing a study that was inadmissible under the evidence rules and the test for novel scientific evidence articulated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). But Woodard has provided no information revealing the details of the study, and the record does not reveal the study's details. Thus, Woodard has failed to show that competent and admissible evidence would establish that the study was inadmissible under the evidence rules or *Frye*, and his claim fails.

F.     *Trial Counsel's Failure To Object to the State's Mischaracterization of 37 Pregnant Girls Study in Closing*

Woodard argues that trial counsel provided ineffective assistance by failing to object to the State's mischaracterization of the conclusion of the study of 37 pregnant girls referenced by Wahl-Hermosillo's testimony. We disagree.

In closing, the State said that the study of 37 pregnant girls concluded that it's difficult to determine whether a hymen is intact, while Wahl-Hermosillo's testimony supported only that the study concluded that it is possible for a woman to have had intercourse and still have an intact hymen. But Woodard does not explain how the State's misstatement of the study's conclusion is more harmful to his case than the study's actual conclusion. Thus, Woodard has failed to show a reasonable probability that but for trial counsel's failure to object, the outcome of his trial would have been different. Therefore, Woodard has failed to show prejudice.[10]

G.     *Trial Counsel's Decision Against Calling a Medical Expert for the Defense*

Woodard argues that trial counsel provided ineffective assistance by failing to call a medical expert for the defense. We disagree.[11]

---

[10] Woodard argues that we should grant his petition because the State's mischaracterization of the study constituted prosecutorial misconduct. In a PRP, prosecutorial misconduct can constitute constitutional error or nonconstitutional error, depending upon the specific misconduct at issue. *See State v. Emery*, 174 Wn.2d 741, 756-57, 278 P.3d 653 (2012); *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 485, 965 P.2d 593 (1998). For the same reason he has failed to show prejudice under the ineffective assistance of counsel standard, Woodard has failed to show either actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice. Thus, Woodard's claim fails whether it asserts an evidentiary or constitutional error.

[11] Woodard also argues that trial counsel was ineffective for failing to *consult* with a medical expert, and requests a reference hearing on this issue. But Woodard failed to show through affidavits or other forms of corroboration that competent and admissible evidence will establish

The State bears the burden of proving Woodard's guilt beyond a reasonable doubt. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). Here, the State's two medical experts both examined M.P. and reached contradictory conclusions as to whether M.P.'s hymen was intact. Furthermore State medical expert Wahl-Hermosillo testified that M.P.'s physical exam had no indications that M.P. had been raped. This testimony raised doubt in favor of Woodard. While calling a third medical expert could have potentially resolved this doubt in favor of Woodard, it could also have resolved this doubt against Woodard. Thus, it is a conceivable legitimate tactic for trial counsel to argue that the State's medical experts created reasonable doubt, rather than call a third medical expert who could have resolved that doubt to Woodard's detriment. Therefore, Woodard has failed to prove that trial counsel was deficient.

H.     *Trial Counsel's Allegedly Incomplete Objection to the Rape Kit and Underwear*

Woodard argues that trial counsel provided ineffective assistance by failing to object to the admission of the rape kit and underwear for a lack of chain of custody. We disagree.

Here, trial counsel's foundation objections to admitting the rape kit and underwear were chain of custody objections. This is evidenced by the colloquy about chain of custody after one of trial counsel's foundation objections, as well as trial counsel's voir dire about chain of custody after another foundation objection. Thus, because trial counsel's foundation objections objected to a lack of chain of custody, Woodard has failed to show that trial counsel was deficient for failing to object to a lack of chain of custody.

---

that trial counsel failed to consult with a medical expert. Thus, because Woodard has not made a threshold showing, he is not entitled to a reference hearing and his claim fails.

No. 45709-1-II

## II. ADMISSION OF THE RAPE KIT AND UNDERWEAR

Woodard argues that admission of the rape kit and underwear without a proper chain of custody denied him a fair trial because the witnesses at trial could not identify the underwear, Deputy Fulton could not identify the rape kit, and no witnesses traced the rape kit and underwear to and from Orchid. We disagree.

We review the trial court's chain of custody rulings for an abuse of discretion. *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). "Before a physical object connected with the commission of a crime may properly be admitted into evidence, it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed." 103 Wn.2d at 21. When the evidence is susceptible to alteration by tampering or contamination, the proponent of the evidence must "establish a chain of custody 'with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with.'" *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002) (emphasis omitted) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989)). In assessing the chain of custody's completeness, the trial court shall consider "'the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it.'" *Campbell*, 103 Wn.2d at 21 (quoting *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)). Minor discrepancies in the chain of custody affect the weight of the evidence, not its admissibility. 103 Wn.2d at 21.

A.   *Inability To Identify the Underwear*

Woodard argues that the underwear was inadmissible because the witnesses could identify only the bag holding the underwear, not the underwear itself. We disagree.

Engler testified that she watched M.P. remove the underwear and place it in the bag, and that Engler sealed the bag with an evidence seal and placed her initials and time stamp on the bag. Engler identified the bag by the evidence seal, the time, and her initials. Shank testified she removed the underwear from the sealed bag, conducted her tests, and resealed the underwear in the bag. Shank identified the bag at trial.

While Shank and Engler did not testify that they could identify the underwear itself, they provided detailed testimony about how they sealed the underwear in the bag and identified the bag at trial. This established the chain of custody with sufficient completeness to render it improbable that the underwear had either been exchanged with another or been contaminated or tampered with. Thus, the trial court did not abuse its discretion by deciding the chain of custody was established. Therefore, Woodard's claim fails.

B.   *Fulton's Inability To Identify the Rape Kit*

Woodard argues that the trial court erred by admitting the rape kit because Fulton could not identify the rape kit at trial. We disagree.

Engler saw the rape kit before Deputy Fulton acquired it and identified the rape kit at trial, after Deputy Fulton had placed it in the refrigerator. Deputy Fulton testified that he took the rape kit from the hospital and placed it in the refrigerator and sealed the refrigerator. Deputy Hensley testified she saw the rape kit, sealed, in the refrigerator. Deputy Hensley identified the rape kit at trial.

This shows that the rape kit did not significantly change from before Deputy Fulton received it until after Deputy Fulton placed it in the refrigerator. Thus, even without Deputy Fulton's identification of the rape kit, the evidence establishes the chain of custody with sufficient completeness to render it improbable that the rape kit had either been exchanged with another or been contaminated or tampered with. Thus, the trial court did not abuse its discretion by deciding the chain of custody was established, and Woodard's claim fails.

C.     *Transfer of the Rape Kit and Underwear to Orchid*

Woodard argues that the trial court erred by admitting the rape kit and underwear because the testimony did not trace the rape kit and underwear to and from Orchid. We disagree.

Three witnesses, Engler, Deputy Hensley, and Shank, saw the rape kit before Orchid had tested it and identified the rape kit at trial after Orchid had tested it. Two witnesses, Engler and Shank, saw the bag before Orchid received it and identified the bag at trial after Orchid had tested it. This shows that the bag and rape kit did not significantly change from before Orchid received it until after Orchid returned it. This sufficiently establishes the chain of custody. Thus, the trial court did not abuse its discretion by deciding the chain of custody was sufficiently established, and Woodard's claim fails.

### III. COMMENT ON THE EVIDENCE

Woodard argues that the trial court commented on the evidence when it told the jury not to visit locations mentioned in the testimony because "conditions may not necessarily be the same as they were when all the actions took place that led to the charges being filed." Petition at 22-23. We disagree.

30

We review constitutional issues de novo. *State v. Vance*, 168 Wn.2d 754, 759, 230 P.3d 1055 (2010). Article IV, section 16 of the Washington State Constitution prohibits trial judges from commenting on the evidence presented at trial. *State v. Deal*, 128 Wn.2d 693, 703, 911 P.2d 996 (1996). An impermissible comment on the evidence is one that conveys the judge's attitude on the merits of the case or permits the jury to infer whether the judge believed or disbelieved certain testimony. 128 Wn.2d at 703.

Here, the trial court's statement occurred before any testimony was presented to the jury, and was intended to communicate to the jurors that they should not visit locations referenced in future testimony to collect information. The comment did not state what actions took place, and did not state that Woodard committed a crime or that any crime was committed. Thus, we hold Woodard has failed to show that the trial court's comment either conveyed its attitude on the merits of the case or permitted the jury to infer whether the trial court believed or disbelieved certain testimony. Therefore, Woodard's claim fails.

## IV. JUDICIAL BIAS

Woodard asserts the trial judge was biased against him because the trial judge said he was trying the case, told trial counsel to be quiet, and ruled against Woodard many times at trial. We disagree.

We review constitutional issues de novo. *Vance*, 168 Wn.2d at 759. Criminal defendants have a due process right to a fair trial by an impartial judge. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22; *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010).

No. 45709-1-II

We generally review claims of judicial bias under the appearance of fairness doctrine, which states that "'a judicial proceeding is valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing.'" *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting *State v. Ladenburg*, 67 Wn. App. 749, 754-55, 840 P.2d 228 (1992)). But the party who argues that a judge has a bias must support the claim with evidence; a claim unsupported by such evidence is without merit. *State v. Post*, 118 Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992). Thus, before we will apply the appearance of fairness doctrine, Woodard must show such evidence of a judge's actual or potential bias. 118 Wn.2d at 619; *Carter*, 77 Wn. App. at 11-12.

First, the trial judge stated he was "trying the case." 5 VRP at 160. This is a correct statement. "[T]ry" means "[t]o examine judicially; to examine and resolve (a dispute) by means of a trial." BLACK'S LAW DICTIONARY 1750 (10th ed. 2014). Thus, because the trial court was examining Woodard's case judicially, the trial court was trying the case. The statement is not evidence of the trial judge's actual or potential bias.

Second, when trial counsel asked the trial court whether he could have his question to Barnes read back, the trial court initially responded by telling trial counsel "you can be quiet," but eventually had the question read back. 4 VRP at 70. While the trial court's comment may reveal the trial judge's frustration, it does not constitute evidence of the judge's actual or potential bias, particularly because the trial court complied with trial counsel's request to have his question to Barnes read back.

32

Woodard's other allegations of bias are simply a listing of the trial court's rulings to which Woodard disagrees, particularly the trial court's rulings during closing argument. These trial court decisions do not provide evidence of an actual or potential bias against Woodard, but rather show legal determinations against Woodard's interests. Thus, Woodard's claim of judicial bias fails.

## V. CUMULATIVE ERROR

Woodard argues that accumulation of errors deprived him of a fair trial. *See State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984). We disagree.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant his or her right to a fair trial, even if each error alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). But the defendant bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of his or her trial. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). Because Woodard has failed to show any prejudicial errors, we hold that Woodard has failed to meet his burden of showing that the accumulated prejudice of multiple trial errors affected the outcome of his trial.

No. 45709-1-II

We deny Woodard's petition.[12]

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Bjorgen, A.C.J.

_____
Lee, J.

---

[12] Woodard requests a reference hearing multiple times in his petition. If the parties' materials raise issues of material fact, we order a reference hearing for the superior court to resolve them. *Rice*, 118 Wn.2d at 886-87. But we will not remand for a reference hearing unless the petitioner has made his threshold showing. *See* 118 Wn.2d at 886-87. On every issue raised by Woodard, either Woodard failed to make a threshold showing, or the parties' submissions to us did not raise any issues of material fact. *See* 118 Wn.2d at 886-87. Thus, we do not order a reference hearing.